**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: DIGITAL ADVERTISING ANTITRUST LITIGATION | MDL No. 3010 |

**RESPONSE OF ASSOCIATED NEWSPAPERS LTD. AND MAIL MEDIA, INC.
IN OPPOSITION TO GOOGLE'S MOTION FOR TRANSFER**

John Thorne
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel:  (202) 326-7900
Fax:  202-326-7999

*Counsel for Associated Newspapers Ltd. and
Mail Media, Inc.*

May 26, 2021

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATEMENT OF INTEREST ..........................................................................4

ARGUMENT ......................................................................................................5

I.    The Government Enforcement Action Should Not Be Consolidated ...........5

II.   The Publisher And Advertiser Actions Should Not Be Joined ......................7

III.  The Publisher Actions Should Be Sent To The Southern District Of New York .........12

A.   New York Is The Most Convenient Forum ..........................................12

B.   The Southern District Of New York And The Second Circuit Have Extensive Experience With Similar Cases .........................................14

C.   The Northern District Of California Has No Advantages ...................16

IV.   Coordination Between The Courts Can Eliminate Duplicative Discovery.................18

V.    Alternatively, The *Daily Mail* Action Should Be Centralized With *Texas v. Google* ..........................................................................................19

CONCLUSION.................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Am. Honda Motor Co., CR-V Vibration Mktg. & Sales Pracs. Litig., In re*,
140 F. Supp. 3d 1336 (J.P.M.L. 2015)..................................................................... 13

*Best Buy Co., Price Match Mktg. & Sales Pracs. Litig., In re*,
672 F. Supp. 2d 1375 (J.P.M.L. 2010)....................................................................... 9

*Credit Default Swaps Antitrust Litig., In re*,
2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)..................................................... 14, 15

*Cuisinart Food Processor Antitrust Litig.*, *In re*, 506 F. Supp. 651 (J.P.M.L. 1981).................. 20

*Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig., In re*,
446 F. Supp. 242 (J.P.M.L. 1978)............................................................................ 11

*Family Dollar Stores, Inc., Access for Individuals with Disabilities Litig., In re*,
466 F. Supp. 3d 1383 (J.P.M.L. 2020)....................................................................... 9

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ....................................... 15

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968)................................. 9

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018)............................................................... 14, 15

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ....................... 9

*London Silver Fixing, Ltd., Antitrust Litig., In re*, 52 F. Supp. 3d 1381 (J.P.M.L. 2014) ............ 15

*NCUA Bd. v. RBS Secs., Inc.*, 2014 WL 12597071 (C.D. Cal. June 10, 2014) ........................... 19

*NCUA Mortgage-Backed Secs. Litig., In re*, 996 F. Supp. 2d 1374 (J.P.M.L. 2014).................. 18

*Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ......................................... 10, 11

*Park W. Galleries, Inc., Mktg. & Sales Pracs. Litig., In re*,
655 F. Supp. 2d 1378 (J.P.M.L. 2009)................................................................. 2, 14

*Platinum & Palladium Antitrust Litig., In re*,
2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ........................................................ 15

*Qualcomm Antitrust Litig., In re*, 273 F. Supp. 3d 1373 (J.P.M.L. 2017).................................. 20

*SeaWorld Mktg. & Sales Pracs. Litig., In re*, 118 F. Supp. 3d 1373 (J.P.M.L. 2015).................. 17

*Sw. Life Ins. Co. Sales Pracs. Litig., In re*, 268 F. Supp. 2d 1377 (J.P.M.L. 2003) ..................... 13

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .................................................. 4

*United States v. Nat'l City Lines, Inc.*, 334 U.S. 573 (1948) ........................................................ 7

**STATUTES**

28 U.S.C. § 1404 ........................................................................................................................ 13

28 U.S.C. § 1407(a) .................................................................................................................... 12

**LEGISLATIVE MATERIALS**

House Antitrust Subcommittee, *Final Rep. and Recommendations, Investigation of Competition in Digital Markets* (Apr. 15, 2021) ....................................................... 3

State Antitrust Enforcement Venue Act of 2021, H.R. 3460, 117th Cong. (introduced May 21, 2021) ................................................................................... 6

State Antitrust Enforcement Venue Act of 2021, S. 1787, 117th Cong. (introduced May 24, 2021) ................................................................................... 7

**OTHER AUTHORITIES**

Amended Complaint, *Cliffy Care Landscaping LLC v. Facebook Inc.*, No. 1:21-cv-360 (D.D.C. May 19, 2021), ECF No. 25 .......................................... 5

Amy Klobuchar, *Antitrust: Taking on Monopoly Power* (2021) .................................................. 7

*Associated Newspapers Ltd. v. Google LLC*, No. 1:21-cv-03446 (S.D.N.Y.)

    Complaint (Apr. 20, 2021), ECF No. 1 .............................................................. 8, 15

    Letter from J. Jacobson to Judge Castel (May 3, 2021), ECF No. 17 ..................... 5

Complaint, *Clarksburg Publ'g Co. v. Google, LLC*, No. 1:21-cv-51 (N.D. W.Va. Apr. 19, 2021), ECF No. 1 ....................................... 5

Complaint, *SPX Total Body Fitness LLC v. Google LLC*, No. 4:21-cv-801 (N.D. Cal. Feb. 1, 2021), ECF No. 1 .......................................... 5

DFP Small Business Online Standard Terms & Conditions, https://www.google.com/doubleclick/publishers/small-business/terms/ (last visited May 26, 2021) ................................................................................... 2

First Amended Complaint, *Inform Inc. v. Google LLC*, No. 1:19-cv-5362 (N.D. Ga. Oct. 9, 2020), ECF No. 35 ..................................... 17

Google Careers, *New York*, https://careers.google.com/locations/new-york/ (last visited May 26, 2021) ................................................................................. 13

*Google Digital Advert. Antitrust Litig., In re*, No. 5:20-cv-3556 (N.D. Cal.)

    First Amended Complaint (Dec. 4, 2020), ECF No. 52 ...................................................... 8, 9

    Order (Mar. 2, 2021), ECF No. 108 ...................................................................................... 17

    Order Granting Mot. To Dismiss (May 13, 2021), ECF No. 143 ...................................... 8, 10

Google Inc., SEC Form 8-K, Ex. 99-1 (Apr. 19, 2007), *available at*
    https://www.sec.gov/Archives/edgar/data/1288776/000119312507084483/dex991.htm ...... 12

Katie Robertson, *New Owner Set for Chicago Tribune, Daily News and Baltimore Sun*,
    N.Y. Times, May 21, 2021 ..................................................................................................... 3

Manual for Complex Litigation (Fourth) § 20.14 (2004) ............................................................ 18

*Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex.)

    Pls.' Response in Opposition to Google's Motion To Transfer (Feb. 2, 2021), ECF No. 46... 5

    Pl.'s Surreply to Google's Mottion to Transfer (Feb. 16, 2021), ECF No. 66 ....................... 18

    Amended Complaint (Mar. 15, 2021), ECF No. 77 .................................................................. 5

    Memorandum Opinion & Order (May 20, 2021), ECF No. 122 ........................................ 6, 13

    Scheduling Order (May 21, 2021), ECF No. 123 ................................................................. 5-6

    Declaration of Danielle Coffey (Feb. 2, 2021), ECF No. 46-17 ............................................ 13

Rex E. Lee, *The American Courts As Public Goods:  Who Should Pay the Costs of
    Litigation?*, 34 Cath. Univ. L. Rev. 267 (1985) .................................................................. 3-4

Transfer Order, *Google Play Store Antitrust Litig., In re*,
    MDL No. 2981 (J.P.M.L. Feb. 2, 2021), ECF No. 89 .......................................................... 13

U.S. Courts, *U.S District Courts – National Judicial Caseload Profile* (Dec. 2020),
    *available at* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_
    distprofile1231.2020.pdf ...................................................................................................... 16

U.S. Dep't of Justice Press Release, "Statement of the Department of Justice's Antitrust
    Division on its Decision to Close Its Investigation of Google Inc.'s Acquisition of
    Admeld Inc." (Dec. 2, 2011), *available at* https://www.justice.gov/opa/pr/statement-
    department-justices-antitrust-division-its-decision-close-its-investigation-google ............... 12

# INTRODUCTION

Google's motion to transfer and centralize a large number of different antitrust claims against it would create a procedural morass that will take years (possibly a decade) for a single court to resolve.  Google has done so many different things to harm competition in publishing and advertising that the litigation to restore competition should be divided between two or three courts, not dropped on a single district judge.  Daily Mail proposes three sets of cases:

1. <u>States</u>.  A multi-state group of State Attorneys General began investigating Google's conduct in July of 2019.  In pre-complaint discovery, the States collected three million documents and interviewed 64 third-party witnesses.  Google has answered the States' complaint and amended complaint, and the district court has set a schedule for finishing discovery leading to a trial in June 2023.  That State AG case is the most advanced of all the pending litigation and should remain where it is.

2. <u>Advertisers</u>.  Most of the cases brought on behalf of advertisers are already consolidated before Judge Freeman in the Northern District of California.  Judge Freeman has partially granted Google's motion to dismiss against the advertisers, with leave to submit an amended complaint.  There are only two other cases brought on behalf of advertisers – one before Judge Haywood Gilliam in the Northern District of California, and one before Judge Ketanji Brown Jackson in the District for the District of Columbia.  (Judge Jackson has been nominated to be a Circuit Judge on the D.C. Circuit, and is awaiting Senate confirmation.)  There has been no answer and no discovery in any of the cases.  The advertiser cases should be centralized before Judge Freeman in the Northern District of California.

3. <u>Publishers</u>.  There are currently six consolidated publisher class actions before Judge Freeman, a single large-publisher complaint filed by Daily Mail in the Southern District of New York, and another 13 small-publisher complaints filed elsewhere in the country.  Daily Mail

agrees that centralization of these cases is warranted, but Judge Freeman is already busy and piling more cases on her docket will not help.

The current posture of publisher cases is largely a result of Google's forum selection clauses in its contracts with smaller publishers and its selective enforcement of those clauses. The publisher class action cases were filed in the Northern District of California because Google required the small-publisher class representatives to agree to Google's home court.  DFP Small Business Online Standard Terms & Conditions ¶ 13.[1]  Google does not deny that it could have filed Section 1404 transfer motions in the 13 individual small-publisher cases filed around the country to bring them to the Northern District of California.

Daily Mail is a large publisher and is not subject to such a forum selection clause.  It sued Google in the Southern District of New York because that is where Daily Mail's U.S. headquarters and most of the witnesses relating to publisher services are located.  Indeed, several other large publishers have forum selection clauses in which Google *requires* litigation against Google to be conducted in the Southern District of New York.  Google's New York forum selection clauses do not reflect a "home court advantage" for Google but instead the business reality that the majority of the relevant Google witnesses regarding its publisher services are located in New York, as Google forthrightly told the Texas court during the Section 1404 transfer argument.  Of course, this Panel is not bound by Google's forum selection clauses.  *See In re Park W. Galleries, Inc., Mktg. & Sales Pracs. Litig.*, 655 F. Supp. 2d 1378, 1379 (J.P.M.L. 2009) ("Contractual forum selection clauses . . . do not limit the Panel's authority with respect to the selection of a transferee district."  (alterations and citation omitted)).  As a forum for the

---

[1] https://www.google.com/doubleclick/publishers/small-business/terms/ (last visited May 26, 2021).

publisher cases, the Southern District of New York has comparative advantages over all other courts because of the location of witnesses and the Southern District's familiarity with similar antitrust conduct in financial markets.

These three courts can coordinate pretrial proceedings to minimize duplicative discovery efforts. Alternatively, if this Panel decides to consolidate advertiser and publisher actions in the Northern District of California, it should allow the State AG action to remain in the Eastern District of Texas due to its advanced posture and should transfer Daily Mail's action to that district because of the similarities between those two cases (and dissimilarities with the other cases). *See* pages 19-20 *infra* and Ex. A.

The importance of these cases to publishers cannot be overstated. The House Antitrust Subcommittee last month concluded that Google is harming "the free and diverse press" and endangering "political and economic liberty." House Antitrust Subcommittee, *Final Rep. and Recommendations, Investigation of Competition in Digital Markets*, at 57-77, 206-11 (Apr. 15, 2021). "[E]ven before the pandemic, more than 2,000 American newspapers closed between 2004 and 2019 and about half of the jobs in the industry were lost." Katie Robertson, *New Owner Set for Chicago Tribune, Daily News and Baltimore Sun*, N.Y. Times, May 21, 2021 (reporting that "Tribune Publishing, the owner of some of the largest metropolitan newspapers in the United States, will be acquired by a hedge fund with a reputation for slashing costs and cutting newsroom jobs").

This Panel should use its authority to select forums that can move promptly. "More is at stake than just money. . . . [T]here is a relationship between the quality of justice and the promptness with which it can be delivered." Rex E. Lee, *The American Courts As Public Goods: Who Should Pay the Costs of Litigation?*, 34 Cath. Univ. L. Rev. 267, 269 (1985). As

litigation wears on, the "linkage between the judicial judgment and the effects that it is intended to have" weakens. *Id*. at 270. As a result, "[j]udicial relief years after the event is seldom adequate." *Id*. at 269. That is especially true in "technologically dynamic markets" marked by "[r]apid . . . change," in which the prospect for adequate relief will dwindle even more rapidly. *United States v. Microsoft Corp.*, 253 F.3d 34, 49-50 (D.C. Cir. 2001).

## STATEMENT OF INTEREST

Plaintiffs Associated Newspapers Ltd. and Mail Media, Inc. (branded "Daily Mail") offer a unique perspective. Daily Mail is by far the private plaintiff (excluding the States' case) that has suffered the most damage from Google's conduct and consequently the private plaintiff that is most familiar with Google's practices. Daily Mail operates the world's most popular English-language newspaper website (dailymail.com) – with ***double*** the unique monthly visitors as The New York Times (225 million vs. 130 million). In the United States, it serves four billion advertisement impressions per month – the vast majority using Google's advertising services (because Google has bought or eliminated the competition). Google's anticompetitive practices have drastically reduced the revenue that Daily Mail receives from advertising below what Daily Mail would receive in a competitive market.

Because of its familiarity with Google's anticompetitive practices, Daily Mail has received and responded to civil investigative demands from the Department of Justice and the State Attorneys General, and its witnesses have been interviewed by several government investigators. While the other private plaintiffs have no doubt also suffered great harm from Google's conduct, they are predominately individuals or small publications that are not as likely to be familiar with the anticompetitive practices at issue and unlikely to have expended the same resources in understanding these cases as Daily Mail.

## ARGUMENT

### I.     The Government Enforcement Action Should Not Be Consolidated

Google's motion obscures the most important action:  the enforcement action brought by 15 States in the Eastern District of Texas.  Google buries that action last in its listing of the cases. *See* Google Br. 8 (listing *Texas v. Google* last).  That is no mistake.  *Texas v. Google* is light years ahead of all other cases before the Panel, is proceeding to trial faster than other government antitrust cases against Google, and Google thus would like to delay it as long as possible.  The 15 States in *Texas v. Google* conducted an 18-month investigation; reviewed millions of documents, interviewed dozens of witnesses, and filed a fully developed complaint in December 2020.  *See* Pl.'s Resp. in Opp'n to Google's Mot. To Transfer at 2, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. Feb. 2, 2021), ECF No. 46; Am. Compl. at 2, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. Mar. 15, 2021), ECF No. 77.  Given the strength of the complaint, Google did not attempt to dismiss it; it answered.

The private actions are still at the starting blocks.  No private plaintiff has conducted discovery.  None has even proceeded past the motions to dismiss that Google has stated it will file in all private actions.  *See* Ltr. from J. Jacobson to Judge Castel at 3, *Associated Newspapers Ltd. v. Google LLC*, No. 1:21-cv-3446 (S.D.N.Y. May 3, 2021), ECF No. 17.  And many of the complaints are bare-bones pleadings that may need to be amended.  *See*, *e.g.*, Compl., *SPX Total Body Fitness LLC v. Google LLC*, No. 4:21-cv-801 (N.D. Cal. Feb. 1, 2021), ECF No. 1; Am. Compl., *Cliffy Care Landscaping LLC v. Facebook Inc.*, No. 1:21-cv-360 (D.D.C. May 19, 2021), ECF No. 25; Compl., *Clarksburg Publ'g Co. v. Google, LLC*, No. 1:21-cv-51 (N.D. W.Va. Apr. 19, 2021), ECF No. 1.  Judge Sean D. Jordan of the Eastern District of Texas, meanwhile, has already set a trial date and the parties there have begun the discovery process in

earnest.  Scheduling Order, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. May 21, 2021), ECF No. 123.

Because the State enforcement action is so much further along, it presents the best hope for publishers to receive meaningful relief from Google's anticompetitive practices on a time table that will make a difference to their businesses.  It would be a severe injustice to move the State enforcement action to join the private cases.  Moving the States' enforcement action to a slower forum along with scores of private actions will necessarily delay it for years – while motions to dismiss are briefed in the private cases, while the private plaintiffs attempt to catch up on discovery, and while a single judge tries to manage a large group of disparate cases.  Google has already unsuccessfully tried to transfer *Texas v. Google* once.  *See* Mem. Op. & Order, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. May 20, 2021), ECF No. 122 (denying Google § 1404 transfer motion).  Google now attempts to relitigate issues Judge Jordan decided against it:  He rejected Google's argument that "the ease of access to sources of proof is relatively greater in the Northern District of California"; he rejected Google's "presum[ption] that [non-party] witnesses reside in Northern California" when Google failed to "point[] to any specific witnesses or entities"; and he rejected the argument that transfer would "preserve judicial economy" noting, to the contrary, that transfer "would . . . introduce a substantial risk of unnecessary delay." *Id*. at 7, 12, 16-17.  Google has provided no basis for a different result here.

Pending legislation also counsels against moving the State AG case.  The leadership of both the House and Senate Antitrust Subcommittees have introduced identical bills to amend Section 1407 to put State antitrust enforcement on a par with United States antitrust enforcement. *See* State Antitrust Enforcement Venue Act of 2021, H.R. 3460, 117th Cong. (introduced by Rep. Buck and co-sponsored by Rep. Cicilline, among others, on May 21, 2021); State Antitrust

Enforcement Venue Act of 2021, S. 1787, 117th Cong. (introduced by Sen. Lee and co-sponsored by Sen. Klobuchar, among others, on May 24, 2021).  In exercising its discretion under Section 1407, the Panel should consider these expressions of Congressional concern that antitrust enforcement is proceeding too slowly.  *Cf.* Amy Klobuchar, *Antitrust: Taking on Monopoly Power* 62-63 (2021) (describing state leadership in the Nation's earliest antitrust enforcement: "The states' actions were clearly fueled by Washington's inability to act.").  Both bills have an effective date of June 1, 2021.  Should the legislation be enacted in its current form after the Panel moved the State AG case from its current forum, the State AG case would be returned back to its original venue, resulting in yet more unnecessary disruption and delay, contrary to the prompt antitrust enforcement the legislation seeks to promote.[2]

## II.    The Publisher And Advertiser Actions Should Not Be Joined

The publishers and advertisers present fundamentally different cases that need not and should not be joined.  The publisher and advertiser suits involve significantly different markets, different Google competitors (or lack thereof), and different mechanisms of competitive harm. Consolidating would, in effect, put two large MDLs before the same judge at the same time. This would create few efficiencies for the courts but tremendous complexity for the plaintiffs. Google asserts that "[a]ll these cases challenge the same alleged practices involving Google's ad tech."  Google Br. at 10.  But "Google's ad tech" is not a single problem:  it contains monopolie*s*.  Publishers and advertisers are each unhappy in their own ways.

---

[2] Even prior to Congress's enactment of Sections 1404 and 1407, the Supreme Court refused to allow antitrust defendants' convenience to determine forum selection: "[P]ermitting the application of *forum non conveniens* to anti-trust cases inevitably would lengthen litigation already overextended in the time required for its final disposition, and thus would violate Congress' declared policy of expediting this type of litigation. . . . Antitrust suits . . . are notoriously . . . long drawn out."  *United States v. Nat'l City Lines, Inc.*, 334 U.S. 573, 589-90 (1948).

One decisive difference between the publisher and advertiser cases is the vastly different markets in which these parties interact with Google.  The advertisers allege two markets, one for search and one for display advertising.  In these markets, the customers are advertisers looking to reach an audience for their products by placing ads alongside search results or on other companies' websites, and the advertiser plaintiffs claim that Google acts as either a monopolist seller or monopolist broker of that advertising space online.  *See* First. Am. Compl. ¶¶ 123-33, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-3556 (N.D. Cal. Dec. 4, 2020), ECF No. 52.[3]  Google's competitors in these markets would be anyone who offers reasonably interchangeable ways of advertising.

The publishers, in contrast, use Google for ad serving services – the inventory management systems that publishers use to manage their online display ad inventory.  In this market, Google has a 90% share that is protected by staggering barriers to entry.  *See* Compl. ¶¶ 34, 58, *Associated Newspapers Ltd. v. Google LLC*, No. 1:21-cv-03446 (S.D.N.Y. Apr. 20, 2021), ECF No. 1 ("*Daily Mail* Compl.").  There is no technologically feasible way for publishers to use another ad server simultaneously with Google's, and – in part because Google ties access to its valuable ad exchange to its ad server – there is no economically feasible way for publishers to switch away from Google's ad server entirely.  *Id.* ¶¶ 54-56.  The reasons for and effects of Google's monopolization of the publisher ad serving market (and the publisher-side ad exchange market) are not dependent on whether Google monopolizes the advertisers' alleged markets.

---

[3] The consolidated complaint also made allegations related to publishers.  Judge Freeman has directed the advertiser class to remove all publisher-related allegations in its next complaint. Order Granting Mot. To Dismiss at 6, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-3556 (N.D. Cal. May 13, 2021), ECF No. 143.

The publishers and advertisers also allege different harms in those markets.  In using Google's publisher-specific ad tech tools, publishers have been forced to accept depressed prices for their ad inventory, a classic antitrust injury.  *See*, *e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).  Advertisers allege that their use of advertiser-specific Google products has caused them to pay supracompetitive fees.  *See*, *e.g.*, First. Am. Compl. ¶ 23, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-3556 (N.D. Cal. Dec. 4, 2020), ECF No. 52.  The extent to which Google purports to pass on its ill-gotten monopoly or monopsony rents in each of those product markets is irrelevant and no defense to antitrust scrutiny.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp*., 392 U.S. 481 (1968).  Publishers and advertisers will thus pursue disparate proof – no pretrial efficiencies will be gained by forcing them into the same court.

Accordingly, this is not a case involving similar antitrust theories with some unique issues for different plaintiffs.  There is no material overlap between the publisher and advertiser plaintiffs.  *See In re Family Dollar Stores, Inc., Access for Individuals with Disabilities Litig.*, 466 F. Supp. 3d 1383, 1383-84 (J.P.M.L. 2020) (denying centralization when "the putative classes [did] not appear to overlap" and a "significant amount of discovery appears almost certain to be case-specific"); *In re Best Buy Co., Price Match Mktg. & Sales Pracs. Litig.*, 672 F. Supp. 2d 1375, 1376 (J.P.M.L. 2010) (denying centralization when "[t]he putative classes in the action . . . [were] not expected to overlap" and the parties "represented . . . that they intend to cooperate in reducing duplicative discovery" despite the fact the actions "share[d] some common factual questions").  The publisher and advertiser cases are at best independent and at worst adverse to one another; and joining the two groups as plaintiffs in a single MDL would cause at best confusion and at worst injustice.

Centralizing together these disparate cases would be an extreme burden on a single court. It will essentially be two MDLs in one.   The litigation history of these cases so far shows why joining all these cases in a single court is not feasible.  Though Judge Freeman has had both publisher and advertiser cases for over a year, she has so far focused solely on the advertiser actions, and the only meaningful progress is one recent motion to dismiss decision.  This has spawned a need for amended complaints.  Order Granting Mot. To Dismiss at 12, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-03556 (N.D. Cal. May 13, 2021), ECF No. 143. Asking Judge Freeman or any single judge to manage the publisher and advertiser cases simultaneously will likely grind both sets of cases to a halt.  It will serve all interests (except Google's interest in delay) for the courts to divide the burden, coordinating as appropriate.

Google's motion (at 10-11) asserts a number of purportedly common issues among all the cases.  Nearly all of these assume the conclusion that the issues are common.  And all ignore that the advertisers and publishers define and claim harm in completely different markets.  Google uses "ad tech" as a shorthand that encompasses vastly different issues and harms.  As explained above, there is no common market definition question.  "The participants in any antitrust market relevant to Google's ad tech" will be completely different for the different markets distorted by Google's ad tech.  So too for "how Google's ad tech interacts with competitors' ad tech."  So too for "the competitive impacts of Google's acquisitions" and "the extent to which" Google's conduct was anticompetitive.

Google's suggestion that these cases should be centralized because they may involve a two-sided transaction market under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), is both wrong and irrelevant.  *Amex* required the plaintiffs to prove (as they could not) that higher transactions fees to merchants were not offset by the greater investment in the credit-card

network that those fees enabled.  *Amex* required such a showing because credit-card networks displayed strong indirect network effects:  a credit-card company that raises merchant fees "risk[s] a feedback loop of declining demand."  *Id.* at 2281.  That is, higher fees lead merchants to leave the network; with fewer merchants, cardholders leave the network; and then even more merchants leave the network because there are fewer cardholders.  *See id.*  The upshot is that *Amex* applies in a special case:  where the defendant is disciplined by *both* buyers and sellers. *See id.* at 2286 ("A market should be treated as one sided when the impacts of indirect network effects and relative pricing in the market are minor.").

Indirect network effects are not at play in any of the markets publishers or advertisers define, for neither publishers nor advertisers discipline Google.  On the publisher side, publishers cannot forgo Google's ad-tech tools because Google has eliminated ad serving rivals, and thus publishers must continue to use Google's ad-serving and suffer the consequences.  On the advertiser side, there is little incentive to discipline Google's conduct because advertisers may be better off, in the short term, if Google depresses the price to advertisers for inventory.  But advertisers also are locked in to Google's ad-tech tools much like publishers – they can access YouTube and Google search inventory only if they use Google's buy-side software.  In any event, even if Google competes in a two-sided *Amex* market, the only practical impact in these cases would be some overlapping discovery.  Publishers would then need discovery into the advertisers' defined markets and vice versa.  Minimal coordination among different courts can solve that issue without creating risks and complexities of joining the publisher and advertiser actions in a single MDL.  *See In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978).  The publisher and advertiser actions should not be combined.

### III.    The Publisher Actions Should Be Sent To The Southern District Of New York

The Southern District of New York is the most appropriate forum for the publisher actions because it is the center of gravity for publishers and Google's advertising services offered to publishers and because of its well-developed case law dealing with the type of anticompetitive conduct at issue (market manipulation).  *See* 28 U.S.C. § 1407(a).

### A.    New York Is The Most Convenient Forum

New York is the hub of the publishing world and is the center of gravity for the publisher actions.  The most popular online publications are headquartered there or nearby, including: Daily Mail, the New York Times, the Wall Street Journal, Fox News, CNN, ESPN, CBS, and many more.  California does not have a comparable base of publishers; indeed, none of the 44 publisher plaintiffs before this Panel are based in California.  This fact is important because many of these publishers are not named plaintiffs but likely will be important sources of third-party discovery.  These publisher witnesses would be inconvenienced by transferring the publisher cases to California.

That Google's headquarters are in California is irrelevant.  While Google's *search business* was founded in California, its *advertising business* is based in New York.  Google grew its advertising business in substantial part by acquiring DoubleClick in 2007, which was (and remains) based in New York.  *See* Google Inc., SEC Form 8-K, Ex. 99-1 (Apr. 19, 2007), *available at* https://www.sec.gov/Archives/edgar/data/1288776/000119312507084483/ dex991.htm.[4]  Google touts New York as its "second largest office" and a "focal point" for

---

[4] Google has also acquired other advertising-related businesses that were based in New York.  *See*, *e.g.*, U.S. Dep't of Justice Press Release, "Statement of the Department of Justice's Antitrust Division on its Decision to Close Its Investigation of Google Inc.'s Acquisition of Admeld Inc." (Dec. 2, 2011), *available at* https://www.justice.gov/opa/pr/statement-department-justices-antitrust-division-its-decision-close-its-investigation-google.

"creative branding" and with "one of Google's biggest" sales teams that "caters to . . . major media companies and ad agencies."  Google Careers, *New York*, https://careers.google.com/ locations/new-york/ (last visited May 26, 2021).  Google has even conceded that most of its relevant witnesses are in New York not California.  *See* Ex. B, Tr. at 49:20-21, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. Mar. 18, 2021) (for 151 relevant witnesses, 67 are in New York and only 60 are in California).  And tellingly, Google has submitted no evidence whatsoever that any of the *relevant* documents are located in the Northern District of California – just as Google failed to do in its recent attempt to transfer *Google v. Texas* pursuant to Section 1404.  *See* Mem. Op. & Order at 8, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. May 20, 2021), ECF No. 122 ("Google has failed to present any evidence of the specific documents or kinds of documents allegedly located in the Northern California.").  Because the relevant witnesses and documents are likely based in New York, New York is the most convenient forum for the publishers.  *See* Transfer Order, *In re Google Play Store Antitrust Litig.*, MDL No. 2981 (J.P.M.L. Feb. 2, 2021), ECF No. 89; *In re Am. Honda Motor Co., CR-V Vibration Mktg. & Sales Pracs. Litig.*, 140 F. Supp. 3d 1336, 1337 (J.P.M.L. 2015); *In re Sw. Life Ins. Co. Sales Pracs. Litig.*, 268 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003).

The Panel should also give no weight to the fact that the Northern District of California has the most cases pending before it.  That does not reflect any preference of the plaintiffs to have their cases litigated there.  Indeed, Daily Mail understands that most plaintiffs will be opposing that forum.  The reason that many plaintiffs filed there is because Google has argued that its form forum selection clauses required suit to be brought there.  *See*, *e.g.*, Decl. of Danielle Coffey, *Texas v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. Feb. 2, 2021), ECF No. 46-17.  While those forum selection clauses may determine the place of trial, the Panel accords them

little to no weight in determining the appropriate forum for pretrial proceedings.  *See In re Park W. Galleries*, 655 F. Supp. 2d at 1379.

> **B.     The Southern District Of New York And The Second Circuit Have Extensive Experience With Similar Cases**

The Southern District of New York is uniquely situated to address the publisher claims against Google because it has a well-developed body of case law for market manipulation, arising from its jurisdiction over the world's leading financial markets.  Much of Google's conduct closely parallels the anticompetitive conduct that the Southern District of New York and Second Circuit see so frequently in cases of market manipulation.

Two cases from the Southern District of New York's docket are illustrative:  *In re Credit Default Swaps Antitrust Litigation*, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014), and *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018).  In those cases, plaintiffs alleged that broker-dealers purchased securities at depressed prices by restricting investors' ability to compare offers in real time.  *See Credit Default Swaps*, 2014 WL 4379112, at *2; *Iowa Pub. Employees' Ret. Sys.*, 340 F. Supp. 3d at 300.  Meanwhile, the broker-dealers constructed for themselves an inter-dealer market in which they (but not investors) could access real-time price information when buying and selling their own securities.  *See Credit Default Swaps*, 2014 WL 4379112, at *3.  Rival exchanges attempted to enter the market to provide better competition – namely, better information to investors – but the broker-dealers eliminated them.  *See id.* at *3-5; *Iowa Pub. Employees' Ret. Sys.*, 340 F. Supp. 3d at 312-16.  This lack of competition led to "supracompetitive bid/ask

spreads" to the detriment of investors.  *Id.* at *3; *see Iowa Pub. Employees' Ret. Sys.*, 340 F. Supp. 3d at 322. [5]

Google's anticompetitive conduct fits that pattern.  Google does not permit publishers (who sell ad space) to compare offers in real time to offers for that ad space that would be made by Google's competitors (rival ad exchanges).  Instead, Google rigs the bids.  Google forces its rivals to bid for ad space first – bids that Google knows because of its dominant market position – and then Google bids one penny higher.  *See Daily Mail* Compl. ¶¶ 101-109; 146-148.  Google goes even further by eliminating rival exchanges that threaten to introduce more competitive bids for publishers' ad inventory.  Google forbids rivals to bid, *see id.*¶¶ 165-169, and forbids publishers from providing information to Google's rivals (such as the identity of the viewer) that the rivals would need to bid for that ad impression, *see id.* ¶¶ 101-103, 155-157.  This conduct has suppressed prices similar to the broker-dealer conduct.  *See id.* ¶¶ 190-194.

No other circuit has a comparable body of precedent to draw upon to resolve these similar claims against Google.  The unsettled law in circuits outside of the Second Circuit will lengthen the time to issue decisions and generate more appellate issues – both of which could substantially prolong an MDL.  This makes the Southern District of New York a superior forum for these cases.  *See In re London Silver Fixing*, 52 F. Supp. 3d at 1381-82 (consolidating market manipulation case in the Southern District of New York because of "a somewhat related MDL" already pending there "to achieve significant efficiencies").

---

[5] The Southern District of New York and Second Circuit have been the site of numerous other leading cases on market manipulation (including those with antitrust implications) – including manipulation of LIBOR, credit default swaps, silver, platinum, foreign exchange rates, and more.  *See, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 52 F. Supp. 3d 1381 (J.P.M.L. 2014); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017).

### C.    The Northern District Of California Has No Advantages

As an initial matter, in advocating for the Northern District of California, Google neglects to mention one of the most important distinguishing factors between the Southern District of New York, the Northern District of California, and the Eastern District of Texas:  the Northern District of California is among the most overburdened in the country.  The median time to trial in the Northern District of California is *37.6 months* and that is for the *median* case – not the Frankenstein MDL that Google wants to create.  The Eastern District of Texas (where *Texas v. Google* should stay) has a median time to trial of 17.5 months while the Southern District of New York takes 30.7 months.  *See* U.S. Courts, *U.S District Courts – National Judicial Caseload Profile* at 11, 35, 66 (Dec. 2020), *available at* https://www.uscourts.gov/sites/default/files/ data_tables/fcms_na_distprofile1231.2020.pdf.  Judges in the Northern District of California have an average of *931 pending cases each*, compared with 689 and 690 for the judges of the Eastern District of Texas and Southern District of New York, respectively.  *Id*.

Nor do any of the remaining factors cited by Google support the Northern District of California.  *First*, Google fails to show (at 16) that Judge Freeman has made substantial progress. There has been no progress at all in the publisher action; Google has not even filed a motion to dismiss the consolidated publisher complaint.  In the advertiser cases that have been pending before Judge Freeman since May 2020, the *only* progress has been partially granting a motion to dismiss with leave to amend, which will lead to an amended complaint and a renewed motion to dismiss.  No discovery has been taken.  That the advertiser cases have been pending before Judge Freeman for a year and will continue to be at the motion-to-dismiss stage for likely another year reflects the complexity of the cases and the enormity of the task before Judge Freeman.  It would be unwise – to say the least – to consolidate even more cases before Judge Freeman.  It would be

particularly unwise to include *Texas v. Google*, which is in the middle of discovery.  This will multiply her workload greatly and cause great delay.

*Second*, Google notes (at 2) that the Northern District of California has the most actions pending before it.  But counting the number of filed cases is a pointless exercise.  Most of the actions pending in that district are class actions that have been consolidated and are now a single action.  *See In re SeaWorld Mktg. & Sales Pracs. Litig.*, 118 F. Supp. 3d 1373, 1374 (J.P.M.L. 2015).  With Judge Freeman's most recent consolidation order, there are essentially only two actions pending before her:  *In re Google Digital Advertising Antitrust Litig.*, No. 20-3556 (N.D. Cal.) and *In re Google Digital Publisher Antitrust Litigation*, No. 20- 8984-BLF (N.D. Cal.). The only other case pending in the Northern District of California is a case that Judge Freeman has already found to be "not related."  *See* Order, *In re Google Digital Advert. Antitrust Litig.*, No. 20-3556 (N.D. Cal. Mar. 2, 2021), ECF No. 108.

*Third*, Google touts (at 16-17) that the first case was filed in the Northern District of California.  That is meaningless given the lack of progress in the cases in that district.  *See* Order Granting Mot. To Stay Discovery, *In re Google Digital Advert. Antitrust Litig.*, 5:20-cv-03556 (N.D. Cal. Dec. 8, 2020), ECF No. 53 (staying discovery).  It is also false.  A related action was filed in the Northern District of Georgia six months before the first action was filed in the Northern District of California.  *See Inform Inc. v. Google LLC*, No. 1:19-cv-5362 (N.D. Ga. filed Nov. 25, 2019).  That case alleges that Google leveraged its monopolies in search and search advertising to gain a monopoly in the "Online Advertising Market" and that Google illegally tied "the purchase of ads on YouTube . . . with Google's own ad buying tools."  First Am. Compl. ¶¶ 104, 135, *Inform Inc. v. Google LLC*, No. 1:19-cv-5362 (N.D. Ga. Oct. 9, 2020), ECF No. 35.  This is not the first time Google has neglected to mention the earlier-filed Georgia

17

case when doing so would have conflicted with the procedural relief it sought.  *See* Pl.'s Surreply to Google's Mot. To Transfer at 2, *Texas v. Google LLC*, No. 4:20-cv-957, (E.D. Tex. Feb. 16, 2021), ECF No. 66 (noting Google had failed to mention the earlier-filed Georgia case).

*Fourth*, Google notes (at 17) that Facebook is headquartered in California and that Amazon is headquartered in Washington.  However, these are just two of many third parties from whom the parties might seek discovery.[6]  There will be many other third parties, and it is likely that many of them will be located in New York because it is the hub of all publishing and advertising.  Google has made no attempt to show that the majority of relevant third parties are in California; it has not even attempted to show that the relevant Facebook and Amazon witnesses are in California or Washington as opposed to New York.

## IV.    Coordination Between The Courts Can Eliminate Duplicative Discovery

Google's purported concern (at 11-12) with duplicative discovery is overblown.  Informal coordination between the three judges, each with distinct types of cases – the advertiser cases, the publisher cases, and *Texas v. Google* – can prevent duplicative discovery.  The Panel's ruling in *In re NCUA Mortgage-Backed Securities Litigation* is instructive.  There, the Panel considered centralizing 14 separate actions pending before three judges across three districts that "share[d] some general common factual questions," including a common party in all actions (NCUA).  996 F. Supp. 2d 1374, 1375 (J.P.M.L. 2014).  However, because there were differences in the legal claims in the cases and because the cases were at different procedural postures, the Panel denied centralization and instead suggested "informal cooperation among the involved attorneys and

---

[6] Facebook is named as a defendant in 14 of 21 cases – 13 of which were filed by the same counsel.  Facebook is not named as a defendant in the most developed case (*Texas v. Google*), in the largest private plaintiff case (*Daily Mail*), or in either of the consolidated advertiser or publisher class complaints before Judge Freeman.

coordination between the involved courts." *Id.* at 1376 (citing Manual for Complex Litigation (Fourth) § 20.14 (2004) (noting "judges can coordinate proceedings in their respective courts to avoid or minimize duplicative activity and conflicts")).

Undersigned counsel were involved in that litigation. The coordination between the three judges was extremely efficient. The fourteen complex security suits were prepared for trial and resolved in a little more than three years with no duplicative discovery conducted (common depositions, common document discovery, etc.). The three judges assigned one judge to be the "coordinating judge" to address discovery issues in consultation with the others. *See NCUA Bd. v. RBS Secs., Inc.*, 2014 WL 12597071, at *1 (C.D. Cal. June 10, 2014). And at the same time, the three judges were able to share the large workload by each addressing the distinct legal issues presented in the cases pending before them – rather than a single judge being overburdened with distinct legal issues from newly transferred cases. That type of arrangement would work well here. Judge Jordan, in particular, would be an ideal candidate for a "coordinating judge" – if he is so willing – given his involvement in the case that is at the most advanced discovery stage. That would eliminate duplicative discovery, and allow the three judges to focus on the specific legal issues that matter to the distinct cases before them.

## V.     Alternatively, The *Daily Mail* Action Should Be Centralized With *Texas v. Google*

As explained above, the State AG action is well on its way through pretrial proceedings and should not be uprooted. If the panel declines to centralize all publisher actions in the Southern District of New York, however, Daily Mail's case should be centralized with the State AG case. Daily Mail's allegations share far more common questions with the States' action than with the actions brought by other publishers. Of the myriad theories of anticompetitive conduct reflected in the various complaints under consideration, those alleged by the States and Daily Mail are most closely aligned. *See* Ex. A (chart comparing allegations of anticompetitive

conduct). The close identity between the allegations in those two complaints promises to produce numerous efficiencies. *In re Qualcomm Antitrust Litig.*, 273 F. Supp. 3d 1373, 1376 (J.P.M.L. 2017) (transferring antitrust action to district in which government enforcement proceeding making the same allegations was pending to "facilitate coordination"); *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 655 (J.P.M.L. 1981) (transferring antitrust action to district where related grand jury investigation was conducted). Moreover, neither Daily Mail nor the States name Facebook as a defendant, unlike other private publisher actions. And Daily Mail has already been involved in the States' enforcement action by producing documents as part of the States' investigation. Should the panel choose not to centralize the publisher actions in New York, the just and efficient conduct of Daily Mail's case would be best served by its centralization with *Texas v. Google*.

## CONCLUSION

For the foregoing reasons, the Panel should transfer the advertiser actions to the Northern District of California for pretrial proceedings and transfer the publisher actions (except *Texas v. Google*) to the Southern District of New York for pretrial proceedings.


Date:  May 26, 2021                                  Respectfully submitted,

/s/ *John Thorne*
John Thorne
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel:  (202) 326-7900
Fax:  202-326-7999
Email: jthorne@kellogghansen.com

*Counsel for Associated Newspapers Ltd. and Mail Media, Inc.*