BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

IN RE: DIGITAL ADVERTISING          MDL No. 3010
ANTITRUST LITIGATION
_____/

**PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO GOOGLE DEFENDANTS'
MOTION FOR TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF
CALIFORNIA PURSUANT TO 28 U.S.C. §1407 FOR COORDINATED
OR CONSOLIDATED PROCEEDINGS**

Plaintiffs[1] in thirteen private, non-class cases[2] brought against both Google, LLC ("Google") and Facebook, Inc. ("Facebook") (collectively, "Defendants"), respectively file this joint response in opposition to Google's Motion for Transfer of Actions to the Northern District of California Pursuant to 28 U.S.C. §1407 for Coordinated or Consolidated Proceedings ("§1407 Motion") (ECF No. 1), and state as follows:

## I.      INTRODUCTION

In 2009, a "Big Tech" CEO with unbridled ambition imagined what the future would look like:

---

[1]    Plaintiffs are comprised of 36 newspaper owners who publish local newspapers with circulation in thirteen states including Arkansas, Delaware, Indiana, Louisiana, Maryland, Mississippi, New Jersey, Ohio, Pennsylvania, Texas, West Virginia, and Wisconsin.  Plaintiffs are collectively referred to herein as the "Newspaper Plaintiffs."

[2]    These cases are as follows:  *HD Media Co., LLC v. Google, LLC*, No. 3:21-cv-00077 (S.D. W. Va.); *AIM Media Ind. Operating, LLC v. Google, LLC*, No. 1:21-cv-00951 (S.D. Ind.); *AIM Media Midwest Operating, LLC v. Google*, No. 2:21-cv-01915 (S.D. Ohio); *AIM Media Tex. Operating, LLC v. Google, LLC*, No. 7:21-cv-00150 (S.D. Tex.); *Brown Cnty. Publ'g Co. v. Google, LLC*, No. 1:21-cv-00498 (E.D. Wis.); *Clarksburg Publ'g Co., d.b.a. WV News v. Google, LLC*, No. 1:21-cv-00051 (N.D. W. Va.); *Coastal Point LLC v. Google, LLC*, No. 1:21-cv-00554 (D. Del.); *Eagle Printing Co. v. Google, LLC*, No. 2:21-cv-00518 (W.D. Pa.); *Ecent Corp. v. Google, LLC*, No. 5:21-cv-00251 (S.D. W. Va.); *Emmerich Newspapers, Inc. v. Google, LLC*, No. 3:21-cv-00274 (S.D. Miss.); *Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-00965 (D. Md.); *Gale Force Media, LLC v. Google, LLC*, No. 2:21-cv-09716 (D.N.J.); *Journal Inc. v. Google, LLC*, No. 1:21-cv-00072 (N.D. Miss.) (collectively referred to herein as the "Newspaper Cases").

It's the year 2015.  The compact device in my hand delivers me the world, one news story at a time.  I flip through my favorite papers and magazines, the images as crisp as in print, without a maddening wait for each page to load.  Even better, the device knows who I am, what I like, and what I have already read.  So while I get all the news and comment, I also see stories tailored for my interests.  I zip through a health story in *The Wall Street Journal* and a piece about Iraq from Egypt's Al Gomhuria, translated automatically from Arabic to English.  I tap my finger on the screen, telling the computer brains underneath it got this suggestion right. . . .  This is a long way from where we are today.  The current technology – in this case the distinguished newspaper you are now reading – may be relatively old, but it is a model of simplicity and speed compared with the online news experience today.[3]

It's now the year 2021.  Thirty-six newspaper owners – direct competitors of Google – have filed thirteen individual lawsuits against Google and Facebook for anticompetitive conduct that is, by all objective measures, eviscerating the newspaper industry.  The very existence of this vital industry – that then Google CEO Eric Schmidt admitted was "critical for a functioning democracy"[4] – is being threatened with extinction.

"News deserts" have taken hold throughout the country, with newsgathering, investigative reporting and critical local news sources drying up.[5]  In its place, a technological behemoth force feeds American citizens with tech-chosen, profit-driven content that simulates the lights, sounds,

---

[3]  Eric Schmidt, *How Google Can Help Newspapers*, WALL ST. J. (Dec. 1, 2009), https://www.wsj.com/articles/SB10001424052748704107104574569570797550520.

[4]  Facebook's co-founder and CEO, Mark Zuckerberg, likewise acknowledged that "[a] free press is critical to a healthy democracy," as well as the importance of newspapers in a free society, admitting that "[l]ocal newspapers have been hardest hit by the technological changes" and that "advertising revenue that used to support journalism now goes to companies like [his]."  Mark Zuckerberg, *Facebook Can Help the News Business*, N.Y. TIMES (Oct. 25, 2019), https://www.nytimes.com/2019/10/25/opinion/sunday/mark-zuckerberg-facebook-news.html.

[5]  The University of North Carolina Hussman School of Journalism and Media keeps track of the exponential increase in "news deserts" in the United States.  *See Do You Live in a News Desert?*, UNC, https://www.usnewsdeserts.com/ (last visited May 24, 2021).  A "news desert," according to UNC, is "a community, either rural or urban, with limited access to the sort of credible and comprehensive news and information that feeds democracy at the grassroots level."

4851-6949-4507.v1

and excitement of a casino rather than informing us with thought-provoking content that educates, inspires and opens up discourse across this diverse and vibrant democracy.

Numerous antitrust cases against Google and Facebook, raising a variety of different allegations by a variety of different groups, are currently pending in venues across the country. For their part, the Newspaper Cases raise materially distinct issues from the class action case that anchors Google's §1407 Motion (*In re Google Digital Advertising Antitrust Litig.*, No. 20-cv-03556-BLF (N.D. Cal.)), pending in Google's chosen home venue, which make them better suited to be litigated in the Newspaper Plaintiffs' chosen forums.  While the Newspaper Plaintiffs believe that some organizational structure may be appropriate for the efficient prosecution of these cases, there are important distinctions among the various groups of cases that warrant the groups be treated differently and counsel that they proceed separately.  Through its §1407 Motion, Google unjustifiably attempts to cherry-pick certain cases and arbitrary groupings of cases in an effort to simply move cases to their home venue, the Northern District of California, despite the fact that they have admitted that most of the relevant witnesses are on the opposite side of the country and despite the fact that the delay this will cause is likely to irreparably harm the Newspaper Plaintiffs.

4851-6949-4507.v1

Each of the thirteen cases filed by the Newspaper Plaintiffs is pending in the Northeast,[6] the Southeast[7] or the Midwest[8] regions of the United States, with the exception of one case filed in Texas.[9]  Another newspaper case is pending in the Southern District of New York.  If the Panel is inclined to centralize the Newspaper Cases with other actions, the Newspaper Plaintiffs respectfully submit that the Eastern District of Texas would be the most appropriate forum for the parties.  Alternatively, the Newspaper Plaintiffs respectfully submit that the Southern District of New York or the District of Columbia would also be appropriate transferee courts.

For the reasons set forth below, Google's §1407 Motion should be denied, in whole or in part, for multiple independent reasons.

## II.     ARGUMENT

### A.     The Panel Should Exclude the Texas State Attorneys General Action from any MDL

As an initial matter, the Newspaper Plaintiffs strongly oppose Google's "second-bite-of-the-apple" attempt to bring the state attorneys general action, *Texas v. Google, LLC*, No. 20-cv-

---

[6]   *Eagle Printing Co. v. Google, LLC*, No. 2:21-cv-00518 (W.D. Pa.); *Gale Force Media, LLC v. Google, LLC*, No. 2:21-cv-09716 (D.N.J.); *Journal Inc. v. Google, LLC*, No. 1:21-cv-00072 (N.D. Miss.).

[7]   *HD Media Co., LLC v. Google, LLC*, No. 3:21-cv-00077 (S.D. W. Va.); *Clarksburg Publ'g Co., d.b.a. WV News v. Google, LLC*, No. 1:21-cv-00051 (N.D. W. Va.); *Ecent Corp. v. Google, LLC*, No. 5:21-cv-00251 (S.D. W. Va.); *Emmerich Newspapers, Inc. v. Google, LLC*, No. 3:21-cv-00274 (S.D. Miss.); *Coastal Point LLC v. Google, LLC*, No. 1:21-cv-00554 (D. Del.); *Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-00965 (D. Md.).

[8]   *AIM Media Ind. Operating, LLC v. Google, LLC*, No. 1:21-cv-00951 (S.D. Ind.); *AIM Media Midwest Operating, LLC v. Google*, No. 2:21-cv-01915 (S.D. Ohio); *Brown Cnty. Publ'g Co. v. Google, LLC*, No. 1:21-cv-00498 (E.D. Wis.).

[9]   *AIM Media Tex. Operating, LLC v. Google, LLC*, No. 7:21-cv-00150 (S.D. Tex.).

4851-6949-4507.v1

00957 (E.D. Tex.) ("Texas State AG Case") into a multidistrict litigation ("MDL") proceeding.[10] As the state attorneys general are sure to explain in more detail, Google tried – but failed – to seek transfer of the Texas State AG Case to the Northern District of California by a motion under 28 U.S.C. §1404 on the *same grounds* it seeks to bring the Texas State AG Case into an MDL under §1407 now.  *See* Memorandum Opinion and Order ("§1404 Denial Order"), *Texas v. Google, LLC*, No. 20-cv-00957 (E.D. Tex. May 20, 2021), ECF No. 121.[11]  Google's use of §1407 to sweep in the Texas State AG Case is a cynical attempt to obtain the same relief.

Moreover, the Texas State AG Case is moving swiftly under the capable stewardship of Judge Sean D. Jordan, who has already set a trial date.  Inclusion of the Texas State AG Case in any MDL would likely grind that case to a halt, substantially prejudicing the states from prosecuting their case on behalf of their individual and corporate citizens.

Further, Congress has recently introduced a proposed amendment to 28 U.S.C. §1407(g) to include state attorney general antitrust enforcement actions as *exempt* from transfer under

---

[10]   As set forth below, this is also Google's second attempt to relate the Section 1 claims brought against Google for conspiring with Facebook, which the Honorable Beth Labson Freeman of the Northern District of California expressly found to be "Not Related," and which have been proceeding before the Honorable Haywood S. Gilliam.  *See* Related Case Order, *In re Google Digital Advertising Antitrust Litig.*, No. 5:20-cv-03556 (BLF) (N.D. Cal. Mar. 2, 2021), ECF No. 108; *see also SPX Total Body Fitness LLC v. Google, LLC*, No. 4:21-cv-00801-HSG (N.D. Cal.). On April 27, 2021, Google sought to administratively continue the court-ordered case management conference before Judge Gilliam, citing Google's intent to file the instant motion before the MDL Panel.  *Id.*, ECF No. 31.  One day later, Judge Gilliam summarily denied Google's motion, *id.*, ECF No. 32, and the parties submitted their Joint Case Management Statement on May 4, 2021. *Id.*, ECF No. 37.  Judge Gilliam held a case management conference on May 11, 2021, *id.*, ECF No. 38, and set a deadline for Google to respond to the complaint before him.  *Id.*, ECF No. 40.

[11]   The Court in the Texas State AG Case also recently held a Rule 16 scheduling conference on May 6, 2021, *see id.*, ECF No. 118, and entered a Scheduling Order on May 21, 2021, *id.*, ECF No. 123, setting a fact discovery cut-off date in approximately one year, and a trial beginning June 5, 2023.

4851-6949-4507.v1

§1407, *see* H.R. 3460; S. 1787,[12] which provides a persuasive rationale to exclude the Texas State AG Case from any MDL here.[13]  At bottom, it would be unfair and highly prejudicial to the state attorneys general to have their case delayed by inclusion in Google's requested MDL.  If necessary, any overlapping discovery between the Texas State AG Case and an MDL, if created, can easily be coordinated between sophisticated counsel.

**B.     The Newspaper Plaintiffs' Private Actions Should Not be Included in any MDL**

In claiming that the Newspaper Plaintiffs' private actions concern "the same allegedly anticompetitive conduct, concerning the same products and services, on behalf of various publisher and advertiser plaintiffs," §1407 Motion at 1, Google overstates the similarities between the cases. There are several reasons why the Newspaper Plaintiffs' cases are different in significant respects to both consolidated class actions pending in that district, particularly *In re Google Digital*

---

[12]   State Antitrust Enforcement Venue Act of 2021, H.R. 3460, 117th Cong. (2021) https://www.congress.gov/bill/117-congress/house-bill/3460?s=1&r=10;   State   Antitrust Enforcement Venue Act of 2021, S. 1787, 117th Cong. (2021) https://www.congress.gov/bill/117-congress/senate-bill/1787?r=1&s=1; *see also* Ashley Gold, *Scoop: House antitrust bill aims to boost state AGs*, Axios (May 21, 2021) (quoting Rep. Ken Buck (R-Colo) as stating, "Through this legislation, many of the inefficiencies and obstacles the states face in enforcing the federal antitrust laws will be eliminated, resulting in quicker resolution for the citizens of those states[.]").

[13]   The same rationale for excluding antitrust actions brought by the United States under §1407(g) – that government suits would "almost certainly be delayed" if consolidated with private suits – would apply with equal force to state attorney general antitrust actions.  *See* H.R. Rep. No. 90-1130, at 5, *reprinted in* 1968 U.S.C.C.A.N. at 1902-03 ("Government suits would then almost certainly be delayed, often to the disadvantage of those injured competitors who would predicate damages actions on the outcome of the Government's suit.").

6

*Advertising Antitrust Litig.*, No. 20-cv-03556-BLF (N.D. Cal.),[14] rendering centralization or consolidation of the Newspaper Plaintiffs' actions with those class actions improper.[15]

***First***, there are ***different parties*** involved.  In terms of defendants, while there is overlap as to Google, ***none*** of the cases pending in the Northern District of California for which Google seeks centralization under §1407 names Facebook as a defendant.[16]  The Newspaper Plaintiffs have all named Facebook as a defendant and, as discussed in greater detail below, the theories, elements, and evidence underlying the Newspaper Plaintiffs' claims against Facebook differ substantially from any claim pending in the Northern District of California that Google seeks to centralize.

---

[14]   Google is also flat-wrong that the "first ad tech" case was filed in the Northern District of California.  *See* §1407 Motion at 3.  In truth, the first "ad tech" case was actually filed in the Northern District of Georgia on November 25, 2019.  *See Inform, Inc. v. Google, LLC*, No. 1:19-cv-05362 (N.D. Ga.).  Interestingly, Google does not seek to transfer *Inform* to another district as part of its requested MDL, *see* Schedule of Actions, ECF No. 1-2, perhaps because Google recognizes that *Inform* is the real first-filed case, which militates against sending the MDL to the Northern District of California.

[15]   To the extent discovery in the Newspaper Plaintiffs' private actions overlaps with discovery in the class cases or the Texas State AG Case, Plaintiffs have no objection to coordinating such discovery.  Indeed, because there are very few groups of law firms representing plaintiffs in the cases listed in Google's Schedule of Actions, informal coordination of discovery should not be complicated.  *See In re Bernzomatic & Worthington Branded Handheld Torch Prod. Liab. Litig. (No. II)*, 410 F. Supp. 3d 1355, 1356 (J.P.M.L. 2019) ("Given the limited number of actions and involved counsel, informal coordination of discovery and other pretrial matters among the parties and involved courts, if the need arises, is preferable to formal centralization under Section 1407."); *In re Credit Suisse Velocity Shares Daily Inverse VIX Short Term Exch. Traded Notes Sec. Litig.*, 326 F. Supp. 3d 1379, 1381 (J.P.M.L. 2018) (same); *see also In re Energy Drilling, LLC , Cont. Litig.*, 140 F. Supp. 3d 1333, 1334 (J.P.M.L. 2015) ("Informal coordination and cooperative efforts by the parties and involved courts can minimize or eliminate duplicative discovery and other pretrial proceedings.").

[16]   While the case before Judge Gilliam alleges a conspiracy between Google and Facebook under Section 1 of the Sherman Act, that case only names Google as a defendant.  *See SPX Total Body Fitness LLC v. Google, LLC*, No. 4:21-cv-00801-HSG (N.D. Cal.), ECF No. 34.

Further, the Newspaper Plaintiffs' cases are brought by owners of local newspapers. In contrast, *Digital Advertising* is brought by advertisers – none of whom is alleged to be a publisher. Advertisers and the Newspaper Plaintiffs are different groups with different relationships to Google, as they function on opposite ends of the advertising market and serve different roles within that (and other) markets. Advertisers are also ***buyers***, who pay to place their ads. The Newspaper Plaintiffs, on the other hand, are ***sellers***, and provide or sell white space (or inventory) to advertisers. The Newspaper Plaintiffs get paid by the advertisers when they integrate advertisements into their news websites or news applications. Between the Newspaper Plaintiffs and advertisers are a host of intermediaries, which provide the services linking advertisers to the Newspaper Plaintiffs. Because they operate at different ends of the market, the *Digital Advertising* plaintiffs and the Newspaper Plaintiffs are situated differently in relation to Google in at least two important respects: (1) when Google provides intermediation services, Google acts as a seller for the newspaper, helping the newspaper find advertising and sell their inventory of white space, while at the same time acting as a buyer for the advertiser, who is looking to bid on, organize and buy inventory from newspapers, and (2) when Google sells ad space, Google acts as a ***competitor*** to our clients, whereby both Google and the newspapers are competing to sell their white space to the customer advertisers. This is particularly noteworthy when the competitor is a newspaper or news organization, where Google's alleged anticompetitive and manipulative conduct is in full display on days when the most newsworthy events are reported and higher ad revenue is generated by the Newspaper Plaintiffs' substantive content.

In addition, none of the class cases are brought by a print newspaper (although two plaintiffs do report the news online). It is true that the plaintiffs in *In re Google Digital Publisher Antitrust Litig.*, No. 20-cv-08984-BLF (N.D. Cal.), seek to represent all persons who received

revenue from Google for displaying advertisements using Google's Ad Exchange services or Ad Network services (*i.e.*, Google publisher customers) (see ECF No. 64, ¶192), which could potentially include the Newspaper Plaintiffs as some of the many putative class members. However, because the Newspaper Plaintiffs are pursuing *individual* claims against Google and Facebook, they are unlikely to ever be members of any certified class, whether for trial or settlement purposes.

   *Second*, there are *different harms* involved.  In *Digital Advertising*, for instance, plaintiffs allege that the *fees* paid by advertisers to Google for intermediation services were too high.  In the Newspaper Plaintiffs' cases, they seek to recover for harm to their businesses, including lost profits and other consequential damages, which are unique to each newspaper.

   The Newspaper Plaintiffs allege (through both their Section 1 and Section 2 claims) that Google, *inter alia*: (1) manipulates how much of the advertisers "ad spend" is accessible to the Newspaper Plaintiffs by manipulating auctions so that Google properties and Facebook deceptively "win" the purported legitimate auctions, which puts 100% of certain dollars in Google's or Facebook's pocket with zero to the Newspaper-competitors; (2) deceptively forecloses proper placement of direct ad sales, which should be given priority, and instead places ads for which Google will garner a profit; (3) places lower quality ads that garner less money onto the Newspaper Plaintiffs' websites, while higher quality ads are placed on Google-owned properties; and (4) deceptively misappropriates the Newspaper Plaintiffs' *own client data*, scrambles it, and thereafter renders it unattainable for use by the Newspaper Plaintiffs unless they pay Google to get it back.  Concerning the Section 1 allegations, the gravamen of the Newspaper Plaintiffs' claim is that Google *and Facebook* secretly agreed on *how the space would be allocated* – not on how much an advertiser would pay or a publisher would receive – but on who would get the placement

at all.  *See, e.g.*, *HD Media Co., LLC v. Google, LLC*, No. 3:21-cv-00077 (S.D. W. Va.), ECF No. 1 at 13.

Further, central to the Newspaper Plaintiffs' damages is the harm they have suffered because of the misuse and inability to effectively monetize their original news content and journalism – damages that, critically, are not claimed by the plaintiffs in *Digital Advertising* or *Digital Publishing*.

**Third**, there are **unique claims** involved.  As explained above, unlike in *Digital Advertising* and *Digital Publishing*, the Newspaper Plaintiffs allege a Section 1 claim under the Sherman Act based on Google's and Facebook's secret "jedi blue" agreement.   Indeed, inclusion of this very allegation in the *SPX Total Body Fitness* matter led Judge Beth Labson Freeman to conclude that *SPX Total Body Fitness* was "**not related**" to either *Digital Advertising* or *Digital Publishing* – a ruling Google claims was "in error."  *See* §1407 Motion at 6; Feb. 4, 2021 Tr. Status H'rg at 22, *In re Google Digital Advertising Antitrust Litig.*, No. 20-cv-03556-BLF (N.D. Cal.), ECF No. 84 (The Court: "I don't know that your case will be related because I haven't seen it.  You mentioned Facebook, and that comes – that's different than these other cases in terms of their allegations, so I'm a little concerned . . . .  But once you mentioned Facebook, I'm not – you know, I'm going to be looking at that carefully.  I'm not sure I'm going down that road.").  *See In re Equity Funding Corp. of Am. Sec. Litig.*, 375 F. Supp. 1378, 1385 (J.P.M.L. 1973) (noting that the Panel "ordered separate coordinated or consolidated pretrial proceedings" for cases that "rested upon a different set of primary facts" than other cases).  The Newspaper Plaintiffs have also asserted claims for unjust enrichment, alleging that Google has improperly benefitted from the Newspaper Plaintiffs' original content – content which provides a significant monetary benefit to Google but, yet, Google does not pay for its use or share in profits it generates from it.

**Fourth**, concerning the alleged **relevant markets**, *Digital Advertising* focuses on a narrow market of the ad technology "services" that link advertisers and publishers.  The relevant market in *Digital Publisher* is similarly defined: the markets for publisher Ad Servers, Ad Exchanges, and Ad Networks.  And, as stated above, the class allegations reflect the markets as pled.  On the other hand, the Newspaper Plaintiffs' cases each allege harm flowing from anticompetitive abuses in the broader digital advertising market.

**Fifth**, the **procedural issues** in the cases differ in very important respects.  The Newspaper Plaintiffs' cases are individual cases, not putative class actions.  Combining the Newspaper Plaintiffs' cases with two massive putative class actions would have serious ramifications for the Newspaper Plaintiffs, who allege that Google's and Facebook's misconduct threatens their financial viability.[17]  Historically, in similar MDL proceedings, individual actions such as the Newspaper Plaintiffs are relegated to the back of the procedural line, delaying resolution of the case and any justice for the Newspaper Plaintiffs.  Under Rule 1 of the Federal Rules of Civil Procedure, the Newspaper Plaintiffs are entitled to a "just, speedy and inexpensive determination" of their cases.  Again, the Newspaper Plaintiffs each allege that they have suffered substantial

---

[17]   Indeed, the Newspaper Plaintiffs allege that the unlawful practices of Google and Facebook threaten the existence of the newspaper industry – particularly local news and journalism. Newspaper advertising revenue, which is critical for funding high-quality journalism, has declined from \$49 billion in 2006 to \$16.5 billion in 2017.  *See* Majority Staff Report and Recommendations, *Investigation of Competition in Digital Markets* (Oct. 6, 2020), https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.  These losses have had dire consequences for the newspaper industry.  Researchers at the University of North Carolina School of Media and Journalism found that the United States has lost nearly 1,800 newspapers since 2004 either to closure or merger, 70% of which were in metropolitan areas.  As a result, the majority of counties in America no longer have more than one publisher of local news, and 200 without any paper whatsoever.  *Id.* at 61.  Additionally, according to the Bureau of Labor Statistics, between 1990 and 2016 nearly 30,000 newspaper jobs disappeared – a 60% industry-wide decline. U.S. Bureau of Labor Statistics, *Employment Trends in Newspaper Publishing and Other Media*, 1990-2016 (June 2, 2016), https://www.bls.gov/opub/ted/2016/employment-trends-in-newspaper-publishing-and-other-media-1990-2016.htm.

4851-6949-4507.v1

losses to its advertising revenue from selling digital advertising space, and Defendants' anticompetitive conduct is harming Plaintiffs' ability to monetize its content. The Newspaper Plaintiffs brought their respective actions against Google and Facebook for antitrust violations – to **promptly** remedy the very real impact of Defendants' actions on their businesses. Every day that passes further threatens their financial viability. To delay prosecution because of inclusion of the Newspaper Plaintiffs' cases in an MDL with two massive consolidated putative class actions would prejudice the Newspaper Plaintiffs, even to the extent of putting viable newspapers (at least for the time being) out of business.

Judge Jordan succinctly explained the problem of consolidating non-class action cases with class cases in his §1404 Denial Order:

> the private class actions pending in the Northern District of California involve different claims, parties, defenses, and damages than this case. Further, the various proposed class plaintiffs in those cases will be required to meet the criteria of Federal Rule of Civil Procedure 23 before they can litigate their claims on a classwide basis. In this regard, the procedural posture of the proposed private class actions in the Northern District of California undermines Google's argument that judicial economy will necessarily be advanced by transferring this case. Those actions are likely to undergo class discovery followed by class-certification motion practice, none of which is relevant to the case pending before this Court. Consolidating this case with multiple putative class actions would therefore introduce a substantial risk of unnecessary delay associated with Rule 23 proceedings, which may be complex and heavily litigated, and which are unrelated to this litigation.

§1404 Denial Order at 15-16. The exact same analysis holds true for the Newspaper Plaintiffs' individual actions.

The Newspaper Plaintiffs seek a logical and procedurally efficient process for litigating their actions. However, as the Supreme Court recognized, it is not uncommon in cases involving far-reaching monopolies for similar conduct to injure many different groups, and for each of those groups to proceed before different courts. *See Apple Inc. v. Pepper*, _ U.S. _, 139 S. Ct. 1514, 1525 (2019) ("Apple's alleged anticompetitive conduct may leave Apple subject to multiple suits

by different plaintiffs. . . .  Multiple suits are not atypical[.]").  Google and Facebook are prime examples.

For all these reasons, the Newspaper Plaintiffs respectfully ask the Panel to deny transfer of their thirteen actions to the Northern District of California.

### C.  Assuming the Panel Creates an MDL and Includes the Newspaper Plaintiffs' Cases, the Eastern District of Texas Is the Most Appropriate Transferee Court

Assuming the Panel creates an MDL and includes the Newspaper Plaintiffs' cases therein, the Newspaper Plaintiffs respectfully submit that the related actions be transferred to Judge Jordan in the Eastern District of Texas, a district with ***no pending MDLs***,[18] for coordinated pretrial proceedings with the Texas State AG Case.[19]  As noted, Judge Jordan has already taken several important steps to advance the Texas State AG Case toward trial.  No case against Google is more advanced, other than perhaps the Department of Justice's case in the District of Columbia (discussed *infra*).  While discovery coordination among parties in different federal district courts could certainly be done, having one judge manage such coordination would be significantly more efficient (as Google acknowledges).  Indeed, as Judge Jordan noted in his §1404 Denial Order, "much of the relevant documentary evidence is contained in Austin, Texas, at the Office of the Attorney General of Texas as a result of the extensive investigation that precipitated this suit."

---

[18]   *See* MDL Statistics Report - Distribution of Pending MDL Dockets by District as of Apr. 15, 2021, at 4, https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-April-15-2021.pdf.

[19]   Of note, the allegations set forth in the Texas AG Case, ECF No. 77, concern and disproportionally affect the competitor Newspaper Plaintiffs.  *See, e.g.*, Google's plan to control and monetize publisher content (¶¶18, 261-262); allegations concerning direct ad sales (¶¶30, 36-40, 177, 181); allegations concerning scrambling of user IDs (¶¶142-146, 148); allegations concerning enhanced dynamic allocation (¶¶176-183); and allegations of Facebook's conspiracy with Google (¶¶12-14, 203-234).

§1404 Denial Order at 9.  And, in the Texas AG Case, "Google . . . specifically named **only one potential nonparty witness** who possibly resides in the Northern District of California and would therefore be inconvenienced by a trial in [the Eastern District of Texas]."

Moreover, given that Judge Jordan has expressed his intent to move the Texas State AG Case along swiftly, the private, non-class Newspaper Plaintiffs[20] would also greatly benefit from such speed and efficiency.  *See* §1404 Denial Order at 19 ("based on both the shorter median disposition and trial times in [the Eastern District of Texas] and the likelihood of a shorter discovery period if this action is kept separate, the Court concludes that this factor weighs against transfer.").  Unlike the class plaintiffs, who must overcome the procedural hurdle of class certification, the private, non-class Newspaper Plaintiffs are more aligned with the Texas State AG Case in seeking an early trial date.  With the Northern District of California currently handling 20 pending MDLs, and a pending civil docket nearly three times that of the Eastern District of Texas,[21] the best choice for an MDL transferee court in this matter is fairly clear.

> **D.    Alternatively, the Southern District of New York, where Google Has Admitted the Majority of Witnesses are Located, Would be an Appropriate Transferee Court for the MDL**

If the Panel concludes that the Eastern District of Texas is an inappropriate forum for an MDL, the Southern District of New York, where the *Daily Mail* case is pending, would also be an appropriate transferee court for the MDL.  This is true for the simple reason that Google itself has conceded that much of its allegedly anticompetitive conduct occurred in the Southern District of

---

[20]  Notably, *Associated Newspapers Ltd. v. Google, LLC*, No. 1:21-cv-03446 ("*Daily Mail*") pending in the Southern District of New York, discussed *infra*, is likewise an individual case on behalf of a newspaper and not a class action.

[21]  *See* U.S. District Courts—Civil Cases Filed, Terminated, and Pending, by Jurisdiction—During the 12-Month Period Ending March 31, 2019, https://www.uscourts.gov/statistics/table/c-1/federal-judicial-caseload-statistics/2019/03/31.

New York, *see Texas v. Google, LLC*, No. 20-cv-00957 (E.D. Tex. Jan. 19, 2021), ECF No. 28 at 4-5, and – contrary to the claim in its motion (*see* §1407 Motion at 12) – that the **largest share** of its witnesses relevant to these actions is located in the Southern District of New York.  *See* Mar. 18, 2021 Hr'g Tr. at 49-50, *Texas v. Google, LLC*, No. 20-cv-00957 (E.D. Tex. Mar. 23, 2021), ECF No. 90; *see also* §1404 Denial Order at 6 (noting that "Google further asserts that, because the complaint refers to a number of Google communications authored or possessed by employees that work in Northern California **or New York**.") (emphasis added).  Moreover, not only is New York City the center of the nation's publishing and advertising industries, with over 1,200 ad agencies alone, many of the ad-tech companies that Google acquired (including DoubleClick), as well as many of the rivals that Google has eliminated, were based in the Southern District of New York.  And, as noted below, the Newspaper Plaintiffs, **their** attendant witnesses, and **their** evidence are likewise located in much closer proximity to New York.

Judge P. Kevin Castel, currently overseeing *Daily Mail*, would be an excellent jurist to guide any MDL.  Judge Castel has ably presided over the MDL styled *In re SunEdison, Inc. Sec. Litig.*, No. 1:16-md-02742-PKC (S.D.N.Y.), since late 2016, and multiple class and individual settlements have already been reached in that case.  Judge Castel has significant experience as an MDL transferee judge, including in other antitrust actions.  *See In re: Set-Top Cable Television Box Antitrust Litig.*, 589 F. Supp. 2d 1379 (J.P.M.L. 2008).

If Judge Castel is not available as a transferee judge for this MDL, the Newspaper Plaintiffs respectfully submit that any member of the Southern District of New York's deep and experienced bench, including significant antitrust experience, could ably steer this litigation on the right path.

**E.      The District of Colombia, Where Multiple Actions Are Currently Pending, Would Likewise be an Appropriate Transferee Court**

If the Panel is inclined to coordinate these cases and declines to do so in the Eastern District of Texas or in the Southern District of New York, the District of Columbia would likewise be an appropriate transferee court.  Currently pending in the District of Columbia are numerous related antitrust enforcement actions against both Defendants Google and Facebook, including: (1) the Department of Justice's case against Google, *United States v. Google LLC*, No. 1:20-cv-03010-APM) (D.D.C. filed Oct. 20, 2020) ("*DOJ v. Google* Case"); (2) the Federal Trade Commission's case against Facebook, *Federal Trade Comm'n v. Facebook, Inc.*, No. 1:20-cv-03590-JEB (D.D.C. filed Dec. 9, 2020) ("*FTC v. Facebook* Case");[22] (3) an antitrust enforcement action by 38 Attorneys General against Google, *State of Colorado v. Google LLC*, No. 1:20-cv-03715-APM (D.D.C. filed Dec. 17, 2020) ("Colorado AG Case"); and (4) an antitrust enforcement action by 48 Attorneys General against Facebook, *State of N.Y. v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C. filed Dec. 9, 2020) ("*AGs v. Facebook* Case").

The *DOJ v. Google* Case and the *Colorado AG* Case have already been consolidated for discovery purposes before Judge Amit P. Mehta; discovery has begun and is ongoing.  As set forth in the Government's Joint Status Report in the *DOJ v. Google* Case, No. 1:20-cv-03010-APM, (D.D.C. Apr. 23, 2021), ECF No. 131, Google has already produced nearly 500,000 documents and the parties have issued subpoenas to approximately 47 third parties.  Moreover, Google and Facebook were required to turn over substantial documentation in response to the House Judiciary

---

[22]   As the Panel is aware, under 28 U.S.C. §1407(g), antitrust actions brought by the United States may not be transferred to another court.

Committee's requests for documents during its investigation of competition in digital markets,[23] all of which have already been produced in the District of Columbia.

Importantly, both the *DOJ v. Google* Case and the Colorado AG Case plead markets most similar to those in the Newspaper Cases; that is, they plead markets for, *inter alia*: (1) general search text advertising; and (2) general search advertising – rather than markets that consist of search advertising services.  *See DOJ v. Google* Case, No. 1:20-cv-03010-APM (D.D.C. Oct. 20, 2020), ECF No. 1, ¶¶97, 101; Colorado AG Case, No. 1:20-cv-03715-APM (D.D.C. Dec. 17, 2020), ECF No. 1, ¶¶ 59, 76, 82.  As such, in terms of legal and factual issues related to market definition, there will be far greater overlap between the Newspaper Cases and the DOJ and Colorado AG case, than between the Newspaper Cases and the class cases pending in the Northern District of California.

In addition to the numerous above enforcement actions, three private lawsuits against both Google and Facebook, which likewise plead a conspiracy under Section 1 of the Sherman Act between Google and Facebook, have already been consolidated before Judge Ketanji Brown Jackson in the District of Columbia.  An amended Complaint was filed in that matter on May 19, 2021, alleging one count of violating Section 1 of the Sherman Act on behalf of a class of purchasers of advertising.  *See Cliffy Care Landscaping LLC v. Facebook, Inc.*, No. 1:21-cv-00360-KBJ (D.D.C. May 19, 2021), ECF No. 25.

---

[23]   *See* Digital Markets Investigation, *Antitrust Investigation of the Rise and Use of Market Power Online and the Adequacy of Existing Antitrust Laws and Current Enforcement Levels*, U.S. HOUSE COMM. ON JUDICIARY, https://judiciary.house.gov/issues/issue/?IssueID=14921 (last visited May 24, 2021).

Given that the Newspaper Plaintiffs, the documents, and most of Google's own witnesses are located on or close to the East Coast, Plaintiffs respectfully suggest that Judge Mehta in the District of Columbia could ably coordinate this litigation.

### F.     The Northern District of California Would Not be an Appropriate Transferee Court

The Northern District of California would not be an appropriate transferee court for an MDL.  Putting aside that – according to Google – the majority of witnesses are located in New York City,[24] there is clearly no "center of gravity" to this case, with the majority of cases pending east of the Mississippi River.  Indeed, Defendants' location in the Northern District of California is less of a consideration when, like here, the majority of actions primarily involve litigants geographically focused elsewhere.  *See, e.g.*, *In re Motor Fuel Temperature Sales Pracs. Litig.*, 493 F. Supp. 2d 1365, 1367 (J.P.M.L. 2007) ("Given the geographic dispersal of constituent actions and potential tag-along actions, no district stands out as the geographic focal point for this nationwide docket.").  As Judge Breyer recently noted,

> The fact is that a lot of the work can be done by way of Zoom, which means the geographical center of a particular piece of litigation becomes less important.  We just talked about how convenient it was to land at the airport and get to a particular point.  That is less important now.  We don't need that now.[25]

---

[24]   *See also* §1404 Denial Order at 7 ("Google has not demonstrated that the ease of access to sources of proof is relatively greater in the Northern District of California than in the Eastern District of Texas."); *id.* at 8-9 ("Google has failed to present any evidence of the specific documents or kinds of documents allegedly located in Northern California.  By contrast, [the State AGs] have provided rebuttal evidence that Google's electronic documents are located in storage facilities outside of Northern California (most of which are closer to this district than to the Northern District of California) and that ten potential third-party witnesses possess relevant documents stored closer to this district.").

[25]   *See* Amanda Bronstad, *Did Monsanto Pay a Plaintiff to Force Preemption Appeal? Plus: Judges Debate Vices and Virtues of Virtual MDL Hearings*, LAW.COM (Apr. 28, 2021), https://www.law.com/2021/04/28/did-monsanto-pay-a-plaintiff-to-force-preemption-appeal-plus-judges-debate-vices-and-virtues-of-virtual-mdl-hearings/.

4851-6949-4507.v1

To be sure, in today's world, in which most discovery is produced in electronic form, responsive documents can be produced by Defendants in Texas or New York as readily in Defendants' home jurisdiction. *See Fanning v. CAPCO Contractors, Inc.*, 711 F. Supp. 2d 65, 70 (D.D.C. 2010) ("[T]he location of documents is increasingly irrelevant in the age of electronic discovery, when thousands of pages of documents can be easily digitized and transported to any appropriate forum."). Moreover, as multinational conglomerates and leviathans of the web and digital advertising market, Defendants have a heavy presence in every judicial district. They not only regularly engage in business within the borders of every District in the United States, but have footprints all over the world. Other than being Google's preferred district, the Northern District of California does not offer *any* unique advantages.

Moreover, the judicial system's existing state of affairs – accelerated by the pandemic – incorporates regular use of technology communications systems. As noted earlier, this emerging trend makes the physical accessibility and convenience of the proposed transferee district less important. The parties can all communicate electronically, which will reduce the amount of required in-person appearances. This technology also allows the Panel to transfer matters to districts that were not traditionally considered "centrally located" (although Texas is fairly central). Broadening the scope of suitable transferee forums will also enable the Panel to increase jurisdictional diversity and provide the opportunity for more judges to gain MDL experience.

Nor are the consolidated cases pending in the Northern District of California much more procedurally advanced,[26] insofar as the parties in that case are still at the pleading stage. But

---

[26]    Notably, in *HD Media Co., LLC v. Google, LLC*, No. 3:21-cv-00077 (S.D. W. Va.), Newspaper Plaintiff HD Media filed its Complaint on January 29, 2021. Defendants were granted extensions to May 18, 2021 to file their respective answers or responses to the Complaint. Instead of doing so, however, at the last minute, Defendants emergently moved to stay those proceedings over plaintiff's objection, which the Court granted without any opportunity for plaintiff to be heard.

4851-6949-4507.v1

perhaps most importantly, as explained above, sending the private Newspaper Plaintiffs' actions

to that court is likely to cause significant delay in resolving their claims because, as in other similar

situations, private plaintiff cases are often relegated to the back of the procedural line.  It would be

highly prejudicial to the Newspaper Plaintiffs if this were to occur.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Panel: (1) deny Google's

§1407 Motion as to the Texas State AG Case; (2) deny Google's §1407 Motion as to Plaintiffs'

cases or, alternatively, transfer Plaintiffs' cases as part of an MDL to the Eastern District of Texas,

the Southern District of New York, or the District of Columbia; and (3) grant such other and further

relief as the Panel deems just and proper.

DATED:  May 26, 2021                    Respectfully submitted,


                                        */s/ Stuart A. Davidson*
                                        STUART A. DAVIDSON
                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone: 561/750-3000
                                        561/750-3364 (fax)
                                        sdavidson@rgrdlaw.com

                                        ***Counsel for Plaintiffs AIM Media Texas
                                        Operating, LLC and AIM Media Indiana
                                        Operating, LLC***

---

Thus, any slight differences in the stages of these proceedings were caused by Defendants' actions, which were presumably done in an attempt to manufacture MDL venue in the Northern District of California by arguing the cases pending there are more procedurally advanced.

4851-6949-4507.v1

/s/ *Michael J. Fuller, Jr.* (w/ permission)

MICHAEL J. FULLER, JR.
FARRELL & FULLER, LLC
1311 Ponce De Leon, Suite 202
San Juan, PR 00907
Telephone: 939/293-8244
939/293-8245 (fax)
mike@farrellfuller.com

***Counsel for Plaintiffs Journal, Inc. and Emmerich Newspapers, Incorporated***

/s/ *Paul T. Farrell, Jr.* (w/ permission)

PAUL T. FARRELL, JR.
FARRELL & FULLER, LLC
1311 Ponce De Leon, Suite 202
San Juan, PR 00907
Telephone: 939/293-8244
939/293-8245 (fax)
paul@farrellfuller.com

***Counsel for Plaintiffs HD Media Company and ECENT Corporation***

/s/ *Clayton J. Fitzsimmons* (w/ permission)

CLAYTON J. FITZSIMMONS
FITZSIMMONS LAW FIRM PLLC
1609 Warwood Avenue
Wheeling, WV 26003
Telephone: 304/277-1700
304/277-1705 (fax)
clayton@fitzsimmonsfirm.com

***Counsel for Plaintiffs Clarksburg Publishing Company, d.b.a. WV News; Eagle Printing Company; and Brown County Publishing Company, Inc. and Multi Media Channels***

4851-6949-4507.v1

*/s/ Steven M. Jodlowski* (w/ permission)

STEVEN M. JODLOWSKI
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
sjodlowski@rgrdlaw.com

**Counsel for Plaintiffs AIM Media Midwest Operating, LLC and Coastal Point LLC**


*/s/ John C. Herman* (w/ permission)

JOHN C. HERMAN
HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6555
404/504-6501 (fax)
jherman@hermanjones.com

**Counsel for Plaintiff Flag Publications, Inc.**


*/s/ Serina M. Vash* (w/ permission)

SERINA M. VASH
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6555
404/504-6501 (fax)
svash@hermanjones.com

**Counsel for Plaintiff Gale Force Media, LLC**

4851-6949-4507.v1