**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: DIGITAL ADVERTISING ANTITRUST LITIGATION | MDL No. 3010 |

**THE PLAINTIFF STATES' OPPOSITION TO GOOGLE'S
MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

I.      The Plaintiff States Conducted an Extensive Pre-Suit Investigation, and the Enforcement
        Action Is Advancing Quickly. ...................................................................................... 3

II.     The Eastern District of Texas' Denial of Google's § 1404 Transfer Motion Undercuts
        Google's Efficiency Arguments. ................................................................................... 5

III.    If Enacted, the State Antitrust Enforcement Venue Act Would Prevent or Undo Transfer
        of the Enforcement Action. ........................................................................................... 6

ARGUMENT ............................................................................................................................ 8

I.      The Enforcement Action Should Not Be Centralized. ...................................................... 8

        A.      Centralization of the Enforcement Action Is neither Just nor Efficient. ................. 9

        B.      Centralization Would Inconvenience the Plaintiff States. .................................... 13

II.     If the Enforcement Action Is Centralized, It Should Be Centralized In the Eastern District
        of Texas. ...................................................................................................................... 14

        A.      Judge Jordan's Court in Plano, Texas Is a Central and Accessible Forum. ........... 15

        B.      Significant Discovery Has Occurred in Texas. ................................................... 18

        C.      Docket Conditions in the Eastern District of Texas Are More Conducive to
                Efficient MDL Management. ........................................................................... 19

        CONCLUSION ............................................................................................................. 20

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*In re African-Am. Slave Descendants Litig.*,
231 F. Supp. 2d 1357 (J.P.M.L. 2002)..............................................................................15

*In re Best Buy Co., Cal. Song-Beverly Credit Card Act Litig.*,
804 F. Supp. 2d 1376 (J.P.M.L 2011)............................................................................ 8-9

*In re: Camp Lejeune, N. Carolina Water Contamination Litig.*,
763 F. Supp. 2d 1381 (J.P.M.L. 2011)...............................................................15, 18, 19

*In re Cement & Concrete Antitrust Litig.*,
437 F. Supp. 750 (J.P.M.L. 1977)......................................................................15, 18, 19

*In re Cessna Aircraft Distrib. Antitrust Litig.*,
460 F. Supp. 159 (J.P.M.L. 1978)......................................................................................8

*In re Colgate Optic White Toothpaste Mktg. & Sales Pracs. Litig.*,
232 F. Supp. 3d 1346 (J.P.M.L. 2016)............................................................................14

*In re Cymbalta (Duloxetine) Prods. Liab. Litig.*,
65 F. Supp. 3d 1393 (J.P.M.L. 2014)............................................................................8, 9

*In re Dietgoal Innovations, LLC ('561) Patent Litig.*,
999 F. Supp. 2d 1380 (J.P.M.L. 2014)..............................................................................9

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
228 F. Supp. 2d 1379 (J.P.M.L. 2002)............................................................................17

*In re Generic Pharm. Pricing Antitrust Litig.*,
MDL 2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017) ......................................... 9-10

*In re Gerber Probiotic Prods. Mktg. & Sales Pracs. Litig.*,
899 F. Supp. 2d 1378 (J.P.M.L. 2012)..............................................................................8

*In re Ironworkers Union Emp't Pracs. Litig.*,
424 F. Supp. 1072 (J.P.M.L. 1976)..................................................................................19

*In re: Kitec Plumbing Sys. Prods. Liab. Litig.*,
655 F. Supp. 2d 1364 (J.P.M.L 2009)..............................................................................15

*In re L. E. Lay & Co. Antitrust Litig.*,
391 F. Supp. 1054 (J.P.M.L. 1975)..................................................................................15

*In re Library Editions of Children's Books*,
297 F. Supp. 385 (J.P.M.L. 1968)...................................................................16

*In re Lithium Ion Batteries Antitrust Litig.*,
923 F. Supp. 2d 1370 (J.P.M.L. 2013)...........................................................20

*In re Managed Care Litig.*,
416 F. Supp. 2d 1347 (J.P.M.L. 2006)...........................................................14

*In re Med. Waste Servs. Antitrust Litig.*,
277 F. Supp. 2d 1382 (J.P.M.L. 2003)...........................................................18

*In re Multi-Piece Rim Prods. Liab. Litig.*,
464 F. Supp. 969 (J.P.M.L. 1979)...................................................................15

*In re: Narconon Drug Rehab. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
84 F. Supp. 3d 1367 (J.P.M.L. 2015)..............................................................11

*In re Nat'l Student Mktg. Litig.*,
368 F. Supp. 1311 (J.P.M.L. 1972) ................................................................19

*In re: Roundup Prods. Liab. Litig.*,
214 F. Supp. 3d 1346 (J.P.M.L. 2016)..................................................... 19-20

*In re Transit Co. Tire Antitrust Litig.*,
350 F. Supp. 1165 (J.P.M.L. 1972).................................................................19

*In re U.S. Postal Serv. Privacy Act Litig.*,
545 F. Supp. 2d 1367 (J.P.M.L. 2008)...........................................................18

*In re Walgreens Herbal Supplements Mktg. & Sales Pracs. Litig.*,
109 F. Supp. 3d 1373 (J.P.M.L. 2015)...........................................................15

*In re Welding Rod Prods. Liab. Litig.*,
406 F. Supp. 2d 1064 (N.D. Cal. 2005) .........................................................18

*In re: Yellow Brass Plumbing Component Prod. Liab. Litig.*,
844 F. Supp. 2d 1377 (J.P.M.L. 2012)...........................................................11

*McNeil Consumer Healthcare, et al. Mktg. & Sales Pracs. Litig.*,
MDL 2190 (J.P.M.L. May 20, 2011), attached as Exhibit H...................9, 10

**Rules and Statutes**                                                                                   **Page(s)**

28 U.S.C. § 1404 .................................................................................................1, 5, 12, 16

28 U.S.C. § 1407 .......................................................................................1, 7, 8, 11, 14, 15

**Miscellaneous Authorities**

15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD D. FREER,
FEDERAL PRACTICE AND PROCEDURE § 3863 (4th ed. 2021) .......................................................11

15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD D. FREER,
FEDERAL PRACTICE AND PROCEDURE § 3864 (4th ed. 2021) .......................................................15

Ken Buck, *Rep. Buck Introduces the State Antitrust Enforcement Venue Act*
(May 21, 2021).................................................................................................................6, 7

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.131 (2014)...........................................15, 18

Mike Lee, *Lee, Klobuchar Introduce Bill to Empower State Antitrust Enforcers*
(May 25, 2021).................................................................................................................6, 7

*Reviving Competition, Part 3: Strengthening the Laws to Address Monopoly Power
Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm.
on the Judiciary*, 117th Cong. (Mar. 18, 2021) ...............................................................7

State Antitrust Enforcement Venue Act of 2021 (H.R. 3460, S. 1787)...............................2-3, 6-7

## **INTRODUCTION**

Following a substantial eighteen-month investigation of Google's anticompetitive and deceptive conduct in web display advertising markets, the Plaintiff States selected the Eastern District of Texas as the convenient and efficient venue to file and litigate a crucially important case—the Enforcement Action—to defend the rights of their citizens and end Google's unlawful monopolies. Filed in December 2020, the Enforcement Action is already well underway in the Eastern District; discovery is ongoing, and trial is set for June 2023. Nevertheless, Google is determined to supplant the Plaintiff States' sovereign choice and litigate exclusively in its own West Coast backyard, even after admitting that most of its relevant employees (those it identified vis-à-vis the Plaintiff States' Complaint) are actually on the other side of the country in New York. At the outset of the Enforcement Action, Google attempted—and failed—to transfer venue to the Northern District of California under 28 U.S.C. § 1404; now, Google again attempts to move to that district, this time with its Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407. But under § 1407, actions pending in different districts may be centralized in an MDL only if transfer will (1) "promote the just and efficient conduct of such actions" and (2) "be for the convenience of parties and witnesses." 28 U.S.C. § 1407.[1] Just as Judge Jordan denied Google's initial attempt to transfer the Enforcement Action out of the Eastern District of Texas for failing to meet § 1404's requirements, the Panel should likewise deny Google's renewed attempt because it fails to meet either of § 1407's requirements.

First, including the Enforcement Action in an MDL will not promote the just and efficient resolution of the various litigation relating to Google's anticompetitive conduct in web display advertising markets ("Google ad tech litigation"). Unlike *all* other Google ad tech litigation, the

---

[1] The Plaintiff States take no position on whether the Panel should centralize the various private actions identified in Google's Motion.

Enforcement Action has long since left the starting gate and is already barreling down the track. It is considerably more advanced, in large part because it arises from and builds on an extensive governmental pre-suit investigation that spanned some eighteen months. The Plaintiff States already served two sets of written discovery and are preparing to take depositions prior to any ruling by the Panel this summer. By contrast, none of the nineteen private actions referenced in Google's Motion have left the starting gate; twelve were filed within the last month, and one was recently dismissed with leave to replead. None of the private plaintiffs would be positioned to participate in the Plaintiff States' depositions this summer.

Moreover, substantial inefficiencies would arise in an MDL due to several unique issues presented in the private actions that are wholly irrelevant to the Enforcement Action, including: (i) Google's efforts to compel various plaintiffs into arbitration; (ii) significant discovery and motion practice relating to class certification; and (iii) resolution of issues regarding the private plaintiffs' standing to pursue state-law claims for deceptive or unfair trade practices. Including the Enforcement Action in an MDL would impede, not promote, a just and efficient resolution—a particularly pernicious result when it delays state governments' ability to protect their citizens from Google's ongoing anticompetitive and deceptive conduct.

Second, centralization would inconvenience the parties and witnesses involved in the Enforcement Action, which is pending in the Eastern District of Texas—a central location and the collective choice of venue by the fifteen Plaintiff States. That choice standing alone is entitled to significant weight. But the importance of this choice is magnified by new proposed bipartisan legislation that would exempt the Plaintiff States from centralization, effective June 1, 2021. Introduced this month, The State Antitrust Enforcement Venue Act of 2021 (H.R. 3460, S. 1787) is retroactive. As such, centralization of the Enforcement Action could be undone after the law

goes into effect, which would create substantial inefficiencies, particularly if the MDL is not in the Eastern District of Texas. To guard against this, the Panel should either exclude the Enforcement Action from any centralization or respect the Plaintiff States' choice of forum by centralizing all Google ad tech litigation in the Eastern District of Texas.

## **BACKGROUND**

Google is a monopolist, generating billions of dollars annually from online advertising. Nearly all online publishers, consumer goods companies, e-commerce entities, and small businesses rely on Google's ad tech to buy and sell online display ads. Google obtained and retains this monopoly power through anticompetitive conduct in violation of both state and federal law.

**I.      The Plaintiff States Conducted an Extensive Pre-Suit Investigation, and the Enforcement Action Is Advancing Quickly.**

Since 2019, the Plaintiff States have led efforts to identify and halt Google's misconduct in ad tech. In July 2019, Texas began to lead a bipartisan multistate investigation, which the Texas Attorney General publicly announced in September 2019, at which time Texas began to serve discovery requests that ultimately yielded the production of millions of documents and the participation of over fifty third-party witnesses. Ex. A ¶ 3; Ex. B.

Less than three months after the Texas Attorney General's announcement, ad tech company Inform filed the first Google ad tech litigation against Google in the Northern District of Georgia, lodging antitrust allegations relating to Google's ad tech practices and making specific reference to the Texas-led investigation. Ex. C ¶¶ 9, 194; Ex. D ¶ 166. Nevertheless, Google's Motion asserts that the first-filed ad tech litigation is in California; it wholly omits reference to the *Inform* ad tech litigation. Br. at 2.[2] Eight months after the Texas Attorney General's announcement, online advertisers likewise sued Google in the Northern District of California, lodging antitrust

---

[2] "Br." refers to Google's memorandum in support of its § 1407 motion, ECF no. 1-1.

allegations relating to Google ad tech. Br. at 3. Since then, other ad tech cases have been filed there, and Judge Freeman consolidated those actions but broke them into two categories: advertiser actions and publisher actions. Br. at 3-4. Judge Freeman stayed discovery in the advertiser litigation, Ex. E, and recently dismissed the advertisers' live complaint with leave to refile. Ex. BB. To date, no discovery has been conducted in any of the advertiser or publisher actions.

In December 2020, the Texas-led investigation culminated in ten Plaintiff States filing the Enforcement Action in the Eastern District of Texas; shortly thereafter, five additional Plaintiff States joined in filing an Amended Complaint. Ex. F; Ex. G. The Enforcement Action is the *only* case in which any discovery has occurred, and the eighteen-month multistate investigation also entailed substantial discovery. In it, Texas issued Civil Investigative Demands (CIDs) to Google, including CIDs dated: September 9, 2019 (104 document requests and 129 interrogatories); February 14, 2020 (twenty-one deposition topics); February 25, 2020 (two document requests); and June 22, 2020 (120 document requests and 132 interrogatories). Ex. A ¶ 4-5. In partial compliance with these CIDs, Google produced more than two million documents to the multistate investigation, including its responses to Texas' September and June CIDs, which entailed production of over 150,000 documents (more than 1.2 million pages), as well as responses and objections to Texas' interrogatories. *Id.* ¶ 6. Texas also obtained sworn statements of ten Google employees, conducted or participated in more than fifty third-party interviews, and issued more than twenty third-party CIDs (receiving more than 700,000 documents in response). *Id.* ¶¶ 7-8.

In addition to the significant discovery progress in the investigation, the Plaintiff States and Google have also been hard at work in the Enforcement Action for more than six months. They have participated in Rule 16 and Rule 26 conferences, exchanged initial disclosures, and submitted a Joint Report addressing various agreements and positions. Google answered the

States' Complaint and Amended Complaint. The Plaintiff States have already served Google with two sets of discovery requests, as well as copies of all Texas-issued third-party CIDs and all documents received in response to those CIDs. *Id.* ¶ 10. And the Court already issued a scheduling order, setting the close of fact discovery in July 2022 and the trial in June 2023. Exs. X, Y.

## II.      The Eastern District of Texas' Denial of Google's § 1404 Transfer Motion Undercuts Google's Efficiency Arguments.

In January 2021, Google moved to transfer the Enforcement Action to the Northern District of California under 28 U.S.C. § 1404, relying on arguments similar to those it now presents to this Panel on efficiency and justice. Ex. CC. Judge Jordan rejected those arguments and denied Google's § 1404 motion, specifically emphasizing "the substantive and procedural distinctions between [the Enforcement Action] and the class cases in the Northern District of California," including the "different claims, parties, defenses, and damages"; the anticipated "complex and heavily litigated" issues of "class discovery followed by class-certification motion practice, none of which is relevant to the [Enforcement Action]"; and the "state-law claims that are not at issue in the private class actions pending in the Northern District of California, including consumer-protection and deceptive-trade-practices claims that are dissimilar to the putative class plaintiffs' claims … [and] implicate differing evidence and legal issues." Ex. DD at 15-17, 19, 21. Based on these remarkable distinctions, Judge Jordan rejected the same basic assertion Google makes here, i.e., that transfer would achieve "overall efficiency," because "[c]onsolidating [the Enforcement Action] with multiple putative class actions would [ ] introduce a substantial risk of unnecessary delay." *Id*. at 16.

Drawing yet another noteworthy distinction, Judge Jordan found that "the discovery required in [the Enforcement Action] will likely be significantly truncated compared to the discovery in the California actions." *Id*. at 19. He reasoned:

> [The Enforcement Action] was filed following an eighteen-month investigation by the Plaintiff States, which involved the production of millions of documents and the participation of over sixty witnesses. Under the circumstances, the materials and information already disclosed in the underlying investigation will aid the discovery process in this case. The parties in the California cases, however, will likely have to collect materials and information that have already been gathered here through the Plaintiff States' pre-suit investigation.

*Id.* at 16. Finally, Judge Jordan recognized the efficiency of maintaining the Enforcement Action in his court: "much of the relevant documentary evidence is contained in Austin, Texas, at the Office of the Attorney General of Texas as a result of the extensive investigation that precipitated this suit"; "Google's electronic documents are located in storage facilities outside of Northern California (most of which are closer to this district than to the Northern District of California)"; and the Eastern District has "shorter median disposition and trial times." *Id.* at 8-9, 19.

## III.    If Enacted, the State Antitrust Enforcement Venue Act Would Prevent or Undo Transfer of the Enforcement Action.

Within the last week, identical bipartisan legislation—the State Antitrust Enforcement Venue Act of 2021—was introduced in both houses of Congress as "a bill to ensure state attorneys general are able to remain in the court they select rather than having their cases moved to a court the defendant prefers."[3] Specifically, Representatives David Cicilline (D-RI) and Ken Buck (R-CO) (Chair and Ranking Member, respectively, of the House Antitrust Subcommittee), introduced H.R. 3460 (Ex. FF) on May 21. *Id.* And on May 24, Senators Amy Klobuchar (D-MN) and Mike Lee (R-UT) (Chair and Ranking Member, respectively, of the Subcommittee on Competition Policy, Antitrust, and Consumer Protection) introduced S. 1787 (Ex. EE).[4] If passed, this

---

[3] Ken Buck, *Rep. Buck Introduces the State Antitrust Enforcement Venue Act* (May 21, 2021), https://buck.house.gov/media-center/press-releases/rep-buck-introduces-state-antitrust-enforcement-venue-act. The proposed legislation is co-sponsored by Representatives Ken Buck (R-CO), David Cicilline (D-RI), Burgess Owen (R-UT), and Dan Bishop (R-NC). *Id.*

[4] Mike Lee, *Lee, Klobuchar Introduce Bill to Empower State Antitrust Enforcers* (May 25, 2021), https://www.lee.senate.gov/public/index.cfm/2021/5/lee-klobuchar-introduce-bill-to-empower-state-antitrust-enforcers.

legislation would delete 28 U.S.C. § 1407(h) in its entirety and amend 28 U.S.C. § 1407(g) to read: "Nothing in this section shall apply to any action in which the United States or a State is a complainant arising under the antitrust laws." *See* Exs. EE, FF.

Representative Buck's statement introducing the legislation explained the bill's general aim: "States play a critical role in enforcing federal antitrust laws and should have the same benefit that is already afforded to federal antitrust enforcers – to select and remain in their preferred venue. Through this legislation, many of the inefficiencies and obstacles the states face in enforcing the federal antitrust laws will be eliminated, resulting in quicker resolution for the citizens of those states." Buck, *supra* n.3. Likewise, Senator Lee noted that "the bill will strengthen federalism by putting state antitrust enforcers on an equal footing" with federal antitrust enforcers for purposes of MDL motions. Lee, *supra* n.4. And as Senator Amy Klobuchar stated, "consumers across the country benefit from the efforts of state authorities to enforce our nation's antitrust laws," so "[t]his bipartisan legislation will allow for more efficient and more effective antitrust enforcement by state attorneys general, which is good for competition and consumers." *Id.* Moreover, this legislation is tailored to this very case. Representative Buck specifically cited Google's efforts to transfer the Plaintiffs States' Enforcement Action to California as exactly the sort of the "gamesmanship" and "forum shopping" the proposed legislation will prevent.[5]

---

[5] *Reviving Competition, Part 3: Strengthening the Laws to Address Monopoly Power Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on the Judiciary*, 117th Cong. (Mar. 18, 2021), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4453 (statement of Rep. Buck at 12:13) ("This fix would have major implications quickly. For example, Google has filed a motion to change venue trying to move Texas' ad tech case to the Northern District of California, and therefore the 9th Circuit, where they have favorable case law on appeal. This fix acknowledges our federalist system of government because it rightly recognizes the sovereignty of the states and pragmatically it would eliminate gamesmanship and forum shopping in these cases by the Big Tech monopolies."). Moreover, Representative Buck's press release averred: "Big Tech monopolists have nearly unlimited resources and shouldn't be able to game the judicial system to shield themselves from legal and regulatory scrutiny." Buck, *supra* n.3.

The effective date of the legislation is June 1, 2021, meaning that any transfer of the Enforcement Action after that date would be retroactively undone. Thus, if the Panel transfers the Enforcement Action into an MDL, passage of this bill will result in substantial inefficiencies and delays associated with undoing that transfer (albeit less so if an MDL were centralized in the Eastern District of Texas, since the Enforcement Action would remain in the same venue). The existence of this proposed legislation introduced by the heads of the antitrust subcommittees in both houses of Congress therefore strongly disfavors including the Enforcement Action in any MDL. Or if the Panel ultimately elects to include the Enforcement Action in an MDL, assigning the MDL to the Eastern District of Texas would largely ameliorate the inefficiencies and inconvenience of transferring the Enforcement Action's venue out of and then back to Texas.

## ARGUMENT

### I.     The Enforcement Action Should Not Be Centralized.

Pursuant to 28 U.S.C. § 1407(a), civil actions *may* be centralized for pretrial proceedings when they involve "one or more common questions of fact." Common questions are a necessary prerequisite, but they are not sufficient on their own to warrant centralization.[6] Rather, overlapping actions should be transferred only if the Panel determines "that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. Centralization under § 1407 "should be the last solution after considered review of all other options."[7]

---

[6] *See In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, 65 F. Supp. 3d 1393 (J.P.M.L. 2014) (noting that the twenty-five actions at issue are "highly similar," but declining to centralize them given the different postures of cases); *In re Cessna Aircraft Distrib. Antitrust Litig.*, 460 F. Supp. 159, 161-62 (J.P.M.L. 1978) ("[A] mere showing that [common] questions exist is not sufficient, in and of itself, to warrant transfer by the Panel.").

[7] *In re Gerber Probiotic Prods. Mktg. & Sales Pracs. Litig.*, 899 F. Supp. 2d 1378, 1379-80 (J.P.M.L. 2012) (quotes omitted) (expressing preference for alternatives such as "cooperation and coordination among the parties and the various transferor courts"); *see also In re Best Buy Co.,*

A. **Centralization of the Enforcement Action Is neither Just nor Efficient.**

1. **Centralization would impede the Plaintiff States' ability to expeditiously protect their citizens from Google's ongoing antitrust violations.**

Google's proposed transfer and centralization would undermine, not promote, the just and efficient resolution of the Enforcement Action. The Enforcement Action is far ahead of every other proceeding, and centralization would only slow the Plaintiff States' discovery process. Indeed, because the Enforcement Action builds on the Plaintiff States' eighteen-month investigation, Judge Jordan recognized that "the discovery required in [it] will likely be significantly truncated compared to the discovery in the California actions." Ex. DD at 19. Judge Freeman, on the other hand, *stayed discovery* in the advertiser ad tech litigation and recently dismissed that complaint with leave to replead. Ex. E; Ex. BB. And in the other private cases, discovery has yet to begin and none have a trial schedule. All private cases will necessarily spend months or years retracing the States' steps just to catch up to the Enforcement Action, and none will be positioned to participate in the States' depositions this summer.

This is precisely the posture where the Panel declines to establish an MDL, because a state's pre-complaint investigation is highly relevant to the Panel's assessment. For example, in *McNeil*, the Panel ruled against adding a state attorney general's action to an existing MDL in large part because, unlike the private actions pending in the MDL, the state's "extensive pre-filing investigation" decreased the amount of anticipated future discovery the state would need.[8] Google's reliance on *In re Generic Pharmaceutical Pricing Antitrust Litigation* is misplaced. MDL

---

*Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378-79 (J.P.M.L 2011) (suggesting parties "could have resolved any duplicative issues through informal coordination").

[8] Ex. H (Order Vacating Conditional Transfer Order, *McNeil Consumer Healthcare, et al. Mktg. & Sales Pracs. Litig.*, MDL 2190 (J.P.M.L. May 20, 2011), ECF No. 40); *see also In re Dietgoal Innovations, LLC ('561) Patent Litig.*, 999 F. Supp. 2d 1380, 1381 (J.P.M.L. 2014); *In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, 65 F. Supp. 3d 1393 (J.P.M.L. 2014).

2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017). The investigation discounted by the Panel there involved only one state plaintiff—not several as is the case here. *Id*. at *2. In contrast to ad tech litigation, the private claims and state claims *all* stemmed from that same state investigation. *Id*. Moreover, discovery had not begun in the states' pharmaceutical litigation but has begun in the Enforcement Action. *Id*. And as Judge Jordan already found, the Enforcement Action is significantly more advanced than all of the private actions. Ex. DD at 16-19. Thus, the Panel's order in *McNeil* is more consistent with the present circumstances, which demonstrate that the Enforcement Action is an especially poor candidate for inclusion in an MDL.[9] And given the Plaintiffs States' law-enforcement responsibilities with respect to their citizens, it would not serve the interest of justice to halt their progress by tethering the Enforcement Action to the private cases.

### 2. Centralization Would Not Prevent Duplicative and Inefficient Proceedings.

While extolling the benefits of efficiency and uniformity to this Panel, Google also argues that plaintiffs in the advertiser action are bound to separately arbitrate their claims. Ex. L at 20-24. Google contends that its contracts with multiple named plaintiffs in that case require individual arbitrations. *Id.* Google's arguments, if accepted, would mean that thousands of absent putative class members would need to pursue individualized arbitration as their sole means of obtaining redress. Google cannot simultaneously insist upon potentially thousands of individualized and duplicative proceedings, while at the same time complaining that a small handful of individual court cases are inefficient and could produce conflicting results. As Google's motion in the advertiser action confirms, Google's Motion here is not actually designed to avoid duplication or

---

[9] Google's citation to other cases involving centralized state enforcement actions that "ar[ose] from the same factual core" as private actions is likewise unavailing. Br. at 15, n. 6. Common factual questions are not enough to warrant centralization, and here, unlike in those cases, the other § 1407 considerations—efficiency, justice, and convenience—do not support centralization of the Enforcement Action.

inconsistency; it is instead meant to ensure that those costs are borne only in the fora Google prefers. Section 1407 was never designed to reward such gamesmanship. The fact that Google itself would create significant duplication and inconsistency through thousands of individual arbitrations militates strongly against transfer.[10]

Even if Google does not successfully compel all private actions to arbitration, "the substantive and procedural distinctions between [the Enforcement Action] and the class cases" will result in inefficient litigation. Ex. DD at 19. Indeed, the Plaintiff States, unlike the private plaintiffs, bring a myriad of state antitrust and deceptive practices claims alongside their federal antitrust claims and seek redress for misconduct across the entire scope of Google's ad tech empire. It therefore should not be transferred to an MDL because "when one or more related cases has significantly greater breadth than the others, possibly in terms of factual issues or the applicable substantive law, it will not be coordinated with the cases to be transferred."[11] And unlike the private actions, the Enforcement Action does not involve any delay-producing "complex and heavily litigated" Rule 23 class proceedings. Ex. DD at 16. Thus, just as Judge Jordan already concluded with respect to transferring this case, it is also quite "likely that [centralizing] this case [in an MDL in] the Northern District of California would result in this litigation being [inefficiently and unjustly] delayed by class proceedings." *See id*. at 19.

### 3. Centralization of the Enforcement Action Is Not Just, and the Plaintiff States Should Not Be Subjected to Google's Adhesion Contracts.

There is nothing "just" about vindicating Google's strategy to litigate everything in its own backyard. *See* 28 U.S.C. § 1407(a). Google argues that all Google ad tech litigation "should be

---

[10] *Cf., e.g.*, *In re: Narconon Drug Rehab. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 84 F. Supp. 3d 1367, 1368 (J.P.M.L. 2015); *In re: Yellow Brass Plumbing Component Prod. Liab. Litig.*, 844 F. Supp. 2d 1377, 1379 (J.P.M.L. 2012).

[11] 15 Charles Alan Wright, Arthur R. Miller & Richard D. Freer, Federal Practice and Procedure § 3863 & n.59 (4th ed. 2021).

centralized in the Northern District of California" because that district, it says, "is home to the first-filed case [sic], to the largest number of cases [and] to the most named plaintiffs." Br. at 2. But Google concealed that the *actual* first-filed case is in Georgia, *see* Exs. C and D, pretending instead that a later-filed suit in the Northern District of California was first out of the gate.

More important, Google attempts to leverage its forum-selection agreements to funnel the fifteen sovereign enforcement actions encompassed by the Enforcement Action into Google's home forum. Indeed, Google successfully forced advertisers and publishers—through contracts of adhesion—to agree to prosecute their antitrust claims against Google in Northern California, or in arbitration. Predictably, numerous ad tech customers sued Google there, not because it was convenient or efficient, but because they had to. *See, e.g.*, Exs. I & J § 14 (Google Terms of Service cited in Ex. L at 21-24). Likewise, all but one of the publisher lawsuits filed elsewhere are bound by forum selection clauses in the Northern District of California and could be subject to transfer there under 28 U.S.C. § 1404. Rather than rely on those forum selection clauses to centralize almost all cases in California, Google attempts to bypass that straightforward approach in an effort to bootstrap the Plaintiff States' Enforcement Action with the private cases in its home court. The Panel should not countenance Google's power play.

Fundamentally, the Enforcement Action is an exercise of sovereign police power by the attorneys general of the Plaintiff States to protect the public welfare and advance the public interest, which makes it particularly inappropriate for centralization. Indeed, as the chief legal officers of the Plaintiff States, these attorneys general proceed in their sovereign capacities to enforce state and federal law. As sovereigns, they seek important relief designed specifically to remedy, prevent, and deter Google's past, ongoing, and future illegal conduct. In suing Google in the Eastern District of Texas, they made a deliberate decision to consolidate and centralize their

sovereign claims in a single court located in the lead state and the middle of the country. Centralization of the Enforcement Action in the Northern District of California would not only defy the § 1407 standard but also harm the public interests these sovereigns seek to protect.

**B.  Centralization Would Inconvenience the Plaintiff States.**

Google concedes that the Panel must consider the interests of "all parties," Br. at 11, but nevertheless champions a result that obviously serves only Google's interests. The Plaintiff States are a group of fifteen geographically diverse states and commonwealths, and their collective choice of venue for the Enforcement Action is the centrally located Eastern District of Texas. The recently proposed State Antitrust Enforcement Venue Act reflects a bipartisan respect for these state enforcers' chosen venue and for their ability to vindicate the rights of their citizens without delay. It thereby underscores the importance of excluding the Enforcement Action from any MDL. If passed, it would be retroactive to June 1, 2021, requiring all state enforcement actions centralized after that date to return to their original venues, creating further inefficiency, inconvenience, and delay for the Plaintiff States and the citizens they seek to protect. *See* Exs. EE, FF.

Moreover, centralization of the Enforcement Action would deprive the Plaintiff States of the significant time, effort, and resources Judge Jordan has already devoted to the States' Enforcement Action, which, if transferred for all purposes as Google requests, would not return to Judge Jordan for trial. Br. at 19. Judge Jordan has entered important, substantive orders after extensive briefing and oral arguments, including a complex protective order and an order denying Google's motion to transfer venue. He has also issued a scheduling order with deadlines for the duration of the Enforcement Action and trial set for June 2023, likely far earlier than would occur in the Northern District of California. *See* Ex. Z. Efficiency calls for preserving Judge Jordan's substantial work and ensuring that the Enforcement Action remains on an expeditious track to trial.

Google's remarkably brief and highly unusual request to transfer the Enforcement Action for pretrial *and trial* would only compound these issues. For this request, Google invokes § 1407(h)—which is permissive, not mandatory, and would be eliminated by the proposed legislation, *see* Exs. EE, FF—but fails even to attempt an explanation of how transfer for trial would "promote judicial efficiency." Br. at 19. Rather, as explained below, the Eastern District of Texas is a far more convenient and efficient forum for trial of the Enforcement Action. Google's lone citation to *In re Managed Care Litig.* fails to support its request, as that decision involved the remand of a private action for trial in its original forum and did not address the propriety of transferring a state antitrust action to another jurisdiction for trial. 416 F. Supp. 2d 1347 (J.P.M.L. 2006). Google cites no decision granting such an extraordinary request.

In sum, transferring the Enforcement Action to the Northern District of California would be unjust, inefficient, and inconvenient for the Plaintiff States, which represent nearly a third of the population of the country. The Enforcement Action should therefore be excluded from any MDL. And if the Panel creates an MDL for the private actions, Judge Jordan, the MDL court, and the Plaintiff States will seek to maximize efficiency through coordination and cooperation.[12] Google should not be permitted to supplant the sovereign judgment of the attorneys general of the fifteen Plaintiff States who have determined that efficiency and justice are best served by jointly prosecuting their Enforcement Action in the Eastern District of Texas.

## II.    If the Enforcement Action Is Centralized, It Should Be Centralized In the Eastern District of Texas.

The Panel looks to several factors when deciding upon a transferee district, including "where discovery has occurred, where cases have progressed furthest, the site of the occurrence of

---

[12] *See, e.g.*, *In re Colgate Optic White Toothpaste Mktg. & Sales Pracs. Litig.*, 232 F. Supp. 3d 1346, 1347 (J.P.M.L. 2016) (discussing potential avenues of coordination and cooperation).

the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges."[13] And of particular importance here, "[a]ntitrust cases are frequently transferred to the district where the government's enforcement action is pending."[14] Based on these considerations, should the Panel decide to include the Enforcement Action in an MDL, it should centralize the Google ad tech litigation in the Eastern District of Texas.[15]

### A.    Judge Jordan's Court in Plano, Texas Is a Central and Accessible Forum.

When the parties, witnesses, and lawyers are dispersed throughout the United States, a geographically central court is best suited to manage the MDL. In *Kitec Plumbing*, for example, the Panel considered a § 1407 transfer of twelve actions pending in nine different district courts across the country.[16] The Panel ultimately held that transfer to the Northern District of Texas was appropriate in part because it offered a "central location"; this principle supports assigning any MDL of the Google ad tech litigation to Judge Jordan in the Eastern District of Texas.[17]

---

[13] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.131 (2014).

[14] WRIGHT, MILLER, & FREER, *supra*, § 3864 & n.29; *see also In re Cement & Concrete Antitrust Litig.*, 437 F. Supp. 750, 752-53 (J.P.M.L. 1977) (transferring cases to "the location of the year-long [state] investigation which preceded the filing of any actions").

[15] *See, e.g.*, *In re L. E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) (centralizing cases in Eastern District of Texas because case pending there was "relatively advanced" and the presiding judge was familiar with the case, and rejecting defendants' argument "that the Eastern District of Arkansas is the more suitable transferee forum because all of the relevant documents and records, all executive officers of defendants, several of defendants' principal officers and many witnesses are located there").

[16] *In re: Kitec Plumbing Sys. Prods. Liab. Litig.*, 655 F. Supp. 2d 1364 (J.P.M.L 2009).

[17] *See id.*; *see also In re Walgreens Herbal Supplements Mktg. & Sales Pracs. Litig.*, 109 F. Supp. 3d 1373, 1376 (J.P.M.L. 2015) ("The Northern District of Illinois … provides a convenient and accessible forum for actions filed throughout the country regarding products sold nationwide."); *In re: Camp Lejeune, N. Carolina Water Contamination Litig.*, 763 F. Supp. 2d 1381, 1382 (J.P.M.L. 2011) ("Most importantly, the Northern District of Georgia is an easily accessible location …."); *In re African-Am. Slave Descendants Litig.*, 231 F. Supp. 2d 1357, 1358 (J.P.M.L. 2002) ("[T]he Northern District of Illinois is … [a] geographically central district [and] will be a convenient location for a litigation becoming nationwide in scope"); *In re Multi-Piece Rim Prods. Liab. Litig.*, 464 F. Supp. 969, 975 (J.P.M.L. 1979) ("[B]ecause the actions presently before the Panel are pending throughout the country and the parties represent that discovery will be nationwide, the geographically central location of Missouri is a commendable factor."); *In re*

The relevant actors in this case are sprinkled throughout the country. As the States noted in their successful opposition to Google's § 1404 transfer motion (and as Google also acknowledges, Br. at 18), the States "provided declarations from a representative sample of thirteen potential nonparty witnesses, including three industry associations that represent many more potential nonparty witnesses, who are located closer to the Eastern District of Texas than the Northern District of California and are willing to travel to [the Eastern District] to testify at trial." Ex. K at 8. Those witnesses "would provide relevant and material testimony about . . . the product markets at issue, competition and barriers to entry in those markets, Google's exclusionary conduct, the anticompetitive effects of that conduct, and Google's deceptive trade practices." *Id*. The States also demonstrated that relevant data is stored closer to the Eastern District of Texas than the Northern District of California. *Id*. at 6, 8. Further, the States "identified thirty-four witnesses who participated in the Plaintiff States' investigation and are located closer to the Eastern District of Texas." *Id.* at 8.

With respect to Google ad tech litigation generally, the cases referenced in Google's Motion are pending in a variety of districts across the country, including districts in Delaware, Indiana, Maryland, Mississippi, New Jersey, New York, Pennsylvania, Ohio, Texas, Washington D.C., West Virginia, and Wisconsin. Br. at 5-8. And given the wide geographic dispersion of the plaintiffs in these cases, a central location like the Eastern District of Texas is highly preferable. The three named plaintiffs in the advertiser class action are from Florida, California, and Georgia. Ex. M ¶¶ 8, 14, 19. In the publisher class action, the named plaintiffs are entities formed in Delaware (2), Oklahoma, New York (2), Wisconsin, and Pennsylvania who are headquartered in

---

*Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968) ("[A]lthough air travel renders both California and New York readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation.").

New York (3), North Carolina, Oklahoma, Wisconsin, and Pennsylvania. Ex. N ¶¶ 22-28. In the other cases cited by Google, Br. at 5-8, the named plaintiffs are in: Louisiana (*Organic Panacea*; Ex. O ¶ 42); Massachusetts (*Negron*; Ex. P ¶ 14); Kansas (*Cliffy Care*; Ex. Q ¶ 11); West Virginia (*HD Media*; Ex. R ¶ 6); England and Wales (*Associated Newspapers*; Ex. S ¶ 11); Delaware and New York (*Associated Newspapers*; Ex. S ¶ 12). So while Google avers that transfer of all these cases to California will serve "the convenience of parties and witnesses," in reality, Google seeks a transfer to serve only "the convenience of Google." *See* Ex. T (though not exhaustive, demonstrating domiciles of many plaintiffs in Google ad tech litigation cases).

Another important consideration is the location of counsel.[18] A review of the docket summaries in the ad tech litigation cited in Google's Motion reveals that the named plaintiffs' lawyers—including the attorneys general—are dispersed throughout the country. Even two-thirds of Google's "lead attorneys" in the advertiser and publisher class actions are located in Washington D.C. and New York. *See* Exs. U, V.

While referencing the distance that state attorneys general must travel to Judge Jordan's court, Br. at 18 n.7, Google disregards the *increased* distance between Northern California and the location of parties like the Florida Attorney General (2,526 miles compared to 891 miles). Google also disregards the likelihood that named plaintiffs—dispersed throughout the country—who filed suit in the Northern District of California did so not out of convenience but because of the forum selection clauses Google foisted on them. Google likewise disregards the fact that its requested transfer to the West Coast will not serve the convenience of United Kingdom- and New York-based plaintiffs or their Washington D.C. counsel in *Associated Newspapers*. Perhaps most

---

[18] *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 228 F. Supp. 2d 1379, 1381 (J.P.M.L. 2002) (considering conservation of "resources of the parties [and] their counsel").

significantly, Google disregards its admission to Judge Jordan that the majority of its own relevant employee-witnesses (those it identified vis-à-vis the Plaintiff States' Complaint) are located in New York. Ex. W at 49. In light of these facts, Google's convenience arguments ring hollow.[19]

A geographically central location for this litigation is especially important given (i) Google's request that the States' Enforcement Action be *tried* by the MDL court, as well as (ii) the problems that distance poses for the MDL court in exercising its broad oversight of discovery disputes in other districts.[20] Judge Jordan's court is in Plano, Texas, less than thirty miles from both Dallas Love Field Airport and DFW Airport, which is one of the world's busiest airports and therefore guarantees ease of access to all interested parties. For parties, lawyers, and witnesses who must travel to Judge Jordan's court by air, the court's central location and proximity to major airports promote convenience.[21] This factor supports assigning any MDL to Judge Jordan.

### B.     Significant Discovery Has Occurred in Texas.

The significant discovery accomplished by the Plaintiff States in the Enforcement Action has occurred principally in Texas. This supports assignment of Google's proposed MDL to Judge Jordan.[22] By contrast, discovery in the private actions has not even begun.

---

[19] *See, e.g.*, *In re U.S. Postal Serv. Privacy Act Litig.*, 545 F. Supp. 2d 1367, 1369 (J.P.M.L. 2008) ("While the District of District of Columbia would no doubt also be an appropriate transferee forum, centralization in the Western District of Washington gives due credit to plaintiffs' choice of forum and will not inconvenience USPS, which has a nationwide presence.").

[20] *See, e.g.*, *In re Welding Rod Prods. Liab. Litig.*, 406 F. Supp. 2d 1064, 1066-67 (N.D. Cal. 2005); *In re Transit Co. Tire Antitrust Litig.*, 350 F. Supp. 1165, 1166 (J.P.M.L. 1972) ("Because of Kansas City's geographically central location, it . . . provides a more convenient forum to *all* parties than either Los Angeles or Philadelphia. Furthermore, . . . as this litigation becomes more national in scope any justification for transferring the cases to either an East or West Coast location will diminish.") (emphasis in original).

[21] *See In re Cement & Concrete Antitrust Litig.*, 437 F. Supp. 750, 753 (J.P.M.L. 1977) ("We note also that Phoenix is well served by air and other means of transportation.").

[22] *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.131 (2004); *In re Med. Waste Servs. Antitrust Litig.*, 277 F. Supp. 2d 1382, 1383 (J.P.M.L. 2003) (assigning MDL to Utah in part because "the attorney general of the state investigated the alleged antitrust conduct at issue"); *Camp Lejeune*, 763 F. Supp. at 1382 (transferring to the forum where "several governmental

### C.      Docket Conditions in the Eastern District of Texas Are More Conducive to Efficient MDL Management.

Comparison of docket conditions in potential MDL venues is an important consideration.[23]

According to the most recent federal court management statistics, the Eastern District of Texas

provides a *far* more efficient option than the Northern District of California:

| | Northern District of California | Eastern District of Texas |
|---|---|---|
| Cases per judgeship | 931 cases | 689 cases |
| Median time from filing to trial | 37.6 months | 17.5 months |
| Median time from filing to disposition | 11.3 months | 8.9 months |
| Cases over three years old | 8.7% of cases | 7.7% of cases |
| Currently pending MDLs | 20 | 0 |

Ex. Z; Ex. AA. Of particular relevance, the fact that *twenty* MDLs are currently pending in the

Northern District of California—as compared to *zero* in the Eastern District of Texas—favors

transfer to the Eastern District.[24] Although Judge Freeman and Judge Jordan are both eminently

qualified, the resources available in the Eastern District provide the better opportunity for efficient

management of this litigation.[25]

---

agencies based their investigations"); *Cement & Concrete*, 437 F. Supp. at 753 (transferring to "the federal district in which the files and documents generated by the Arizona Attorney General's investigation are located"); *In re Ironworkers Union Emp't Pracs. Litig.*, 424 F. Supp. 1072, 1074 (J.P.M.L. 1976) (transferring to the forum where the government's records of its joint investigation were located").

[23] *See In re Nat'l Student Mktg. Litig.*, 368 F. Supp. 1311, 1318 (J.P.M.L. 1972) ("Even more significantly, the median time interval from issue to trial in civil cases was eighteen months in the District of Columbia but twenty-seven months in the Southern District of New York."); *In re Transit Co. Tire Antitrust Litig.*, 350 F. Supp. 1165, 1166 & n.2 (J.P.M.L. 1972) ("Another factor favoring the … transferee district is the current status of its civil docket," where that district enjoyed only a one-month advantage in median time between case filing and trial).

[24] *See Camp Lejeune*, 763 F. Supp. 2d at 1382 (assigning case to district in large part because it "does not have many MDLs on its docket").

[25] The States anticipate Google will argue that Judge Jordan is less qualified because he was appointed to the bench in 2019. But Judge Jordan has already been active, effective, and efficient in this litigation, and the Panel has embraced the opportunity to assign MDLs to new judges who have not yet had the opportunity to preside over an MDL. *See, e.g.*, *In re: Roundup Prods. Liab.*

In addition to the general docket conditions, Judge Jordan has shown specific commitment to the expeditious resolution of this case. While all of the private actions linger in the pleading stage with no trial dates set, Judge Jordan has already issued a scheduling order setting deadlines for the entirety of the Enforcement Action, including completion of fact discovery by July 2022 and trial in June 2023. Ex. Y. And expeditious resolution is especially important here, where the Plaintiff States allege that Google's monopolization has produced and continues to produce significant anticompetitive effects in ad tech markets. Ensuring a speedy trial, and implementing the structural relief the States seek, is the only way to restore competition in these crucial markets.

## **CONCLUSION**

Transfer and centralization of the Enforcement Action with all Google ad tech litigation in the Northern District of California would *not* promote just and efficient conduct in this litigation; nor would it promote convenience of the parties and witnesses. Accordingly, if the Panel is inclined to create Google's requested MDL, the States respectfully request that their Enforcement Action be excluded. In the alternative, the Plaintiff States request that Google's requested MDL be assigned to Judge Jordan in the Eastern District of Texas.

---

*Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016); *In re Lithium Ion Batteries Antitrust Litig.*, 923 F. Supp. 2d 1370 (J.P.M.L. 2013) (Judge Gonzalez Rogers confirmed in November 2011 and assigned an MDL in February 2013).

Dated: May 26, 2021                              Respectfully submitted,

W. Mark Lanier (Lead Counsel)
The Lanier Law Firm, P.C.
10940 W. Sam Houston Pkwy N., Suite 100,
Houston, TX 77064
713-659-5200
mark.lanier@lanierlawfirm.com
*Counsel for plaintiff states of Texas, Idaho,*
*Mississippi, North Dakota, and South Dakota*

*/s/ Brent Webster w/permission*

Brent Webster
First Assistant Attorney General of Texas
Office of the Attorney General of Texas
P.O. Box 12548 (MC001)
Austin, TX 78711-2548
512-936-0680
Brent.Webster@oag.texas.gov
*Counsel for plaintiff state of Texas*

*/s/ Grant Dorfman w/permission*

Grant Dorfman
Deputy First Assistant Attorney General
Office of the Attorney General of Texas
P.O. Box 12548 (MC001)
Austin, TX 78711-2548
512-936-0680
Grant.Dorfman@oag.texas.gov
*Counsel for plaintiff state of Texas*

*/s/ Shawn E. Cowles w/permission*

Shawn E. Cowles
Deputy Attorney General for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC001)
Austin, TX 78711-2548
512-936-7947
Shawn.Cowles@oag.texas.gov
*Counsel for plaintiff state of Texas*

21

*/s/ James R. Lloyd w/permission*

James R. Lloyd
Chief, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548 (MC075)
Austin, TX 78711-2548
512-936-1674
James.Lloyd@oag.texas.gov
*Counsel for plaintiff state of Texas*


*/s/ Jeffery G. Pickett w/permission*

Jeffery G. Pickett
Senior Assistant Attorney General
Special Litigation Section
State of Alaska, Department of Law
1031 W. 4th Ave., Suite 200
Anchorage, AK 99501
907-269-5275
Jeff.pickett@alaska.gov
*Counsel for plaintiff state of Alaska*


*/s/ Johnathan R. Carter w/permission*

Johnathan R. Carter
Assistant Attorney General
Office of Arkansas Attorney General Leslie
Rutledge
323 Center Street, Suite 200
Little Rock, AR 72201
501-682-8063
Johnathan.carter@arkansasag.gov
*Counsel for plaintiff state of Arkansas*


*/s/ Lee Istrail w/permission*

Lee Istrail
Assistant Attorney General
Office of the Florida Attorney General
PL-01, The Capitol, Tallahassee, FL 32399
850-414-3841
Lee.istrail@myfloridalegal.com
*Counsel for plaintiff state of Florida*

*/s/ Matthew Michaloski w/permission*

Matthew Michaloski
Deputy Attorney General
Office of Attorney General Todd Rokita
302 W Washington Street
IGCS Fifth Floor
Indianapolis, IN 46204
317-234-1479
Matthew.Michaloski@atg.in.gov
*Counsel for plaintiff state of Indiana*

*/s/ Philip Heleringer w/permission*

Philip Heleringer
Assistant Attorney General
1024 Capital Center Drive, Suite 2000
Frankfort, KY 40601
502-696-5647
Philip.heleringer@ky.gov
*Counsel for plaintiff commonwealth of Kentucky*

*/s/ Kimberley Biagioli w/permission*

Kimberley Biagioli
Assistant Attorney General
Missouri Attorney General's Office
615 E. 13th Street, Suite 401
Kansas City, MO 64106
816-889-3090
Kimberley.Biagioli@ago.mo.gov
*Counsel for plaintiff state of Missouri*

*/s/ Charles J. Cooper w/permission*

Charles J. Cooper
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
202-220-9660
ccooper@cooperkirk.com
*Counsel for plaintiff state of Montana*

23

/s/ Marie Martin w/permission

Marie Martin
Senior Deputy Attorney General
Nevada Office of Attorney General
100 N. Carson Street
Carson City, NV 89701
775-420-4284
mwmartin@ag.nv.gov
*Counsel for plaintiff state of Nevada*


/s/ Thaizza M. Rodriguez w/permission

Thaizza M. Rodriguez
Assistant District Attorney
Special Assistant to the Attorney General
Department of Justice of Puerto Rico
Office of the Attorney General of Utah
PO Box 9020192
San Juan, PR 00902
(787) 721-2900
trodriguez@justicia.pr.gov
*Counsel for plaintiff commonwealth of Puerto Rico*


/s/ Tara W. Pincock w/permission

Tara W. Pincock
Assistant Attorney General
Office of the Attorney General of Utah
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0874
tpincock@agutah.gov
(385) 881-3958
*Counsel for plaintiff state of Utah*