**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: Digital Advertising Antitrust Litigation | MDL No. 3010 |

**GOOGLE DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR
TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

Plaintiffs appear to resist centralization on the premise that Google has been accused of antitrust violations and that the normal rules of MDL centralization should somehow not apply. Instead, the plaintiffs contend that 19[1] cases challenging the same alleged conduct should clog 16 separate courts, squandering party, third-party, and judicial resources, and raising the prospect of inconsistent and conflicting rulings on the many common issues across these cases. While Google of course disagrees with the plaintiffs' claims, the ultimate evaluation of the merits of those claims does not change the MDL rules.

Plaintiffs no doubt see a tactical advantage in forcing Google (and Facebook) to defend multiple parallel cases at the same time. But they do not seriously dispute the efficiencies to be gained from coordinating all of these related cases. Plaintiffs do not address the inefficiencies that will result if 19 related cases proceed in 16 different judicial districts. Some of the plaintiffs quibble at the margins with Google's characterizations of their claims, or assert that certain plaintiffs are differently situated. But many plaintiffs acknowledge the central truth that these cases are all about Google's alleged dominance and purported anticompetitive activity in so-called display advertising technology. Judge Jordan in the Eastern District of Texas, while denying Google's motion to transfer, acknowledged that "the central allegations in the cases pending

---

[1] Since Google filed its Motion, Judge Freeman consolidated *Organic Panaceas* with *Digital Advertising.*

against [Google] in the Northern District of California **mirror the core allegations** of the Plaintiff States here; that is, that Google has engaged in purportedly anticompetitive conduct in markets associated with online display advertising." Ex. X (State AG Transfer Order) at 15.[2]  He further found these cases to be "**premised on the same underlying theories** concerning Google's alleged anticompetitive conduct." *Id.* at 17.  The differences among the Ad Tech cases pale in comparison to their similarities.  None of those differences precludes centralization nor counsels in favor of excluding any one case from the MDL.

No plaintiff seriously argues otherwise.  Take Associated Newspapers: they concede that it would be appropriate to centralize their case with at least the other newspaper cases, but then argue that if they are not sent to their chosen forum (S.D.N.Y.), they want to be centralized with a *different* case, the State AG case.  The other newspaper plaintiffs take the remarkable position that their 12 nearly identical cases, filed around the country, should not be centralized at all.  And while no plaintiff attempts to distinguish its case factually from the State AG case, every objecting plaintiff asks to exempt that case from centralization.  The reason, while not articulated, is obvious: plaintiffs seek to gain an advantage by having as many cases pending in as many jurisdictions as possible, including one in a jurisdiction chosen only because of its popularity with plaintiffs and its ties to the Texas State Attorney General.

A.      **MDL will not "slow down" the State AGs' case or any other cases.**

The plaintiffs complain that centralizing all of these cases will "inevitably" slow one or the other case down.  This risk could be cited in opposition to **any** MDL centralization.  And here, the risk is not acute.  Aside from pointing out that some cases will require a class-certification procedure and inaccurate hyperbole that the State AG case is "light years" ahead of their own, no

---

[2] In this brief, all emphasis is added unless otherwise noted.

plaintiff provides any actual reason why a slowdown would occur.  More to the point, no plaintiff explains why speed should outweigh all the other efficiencies that MDL would create.

Plaintiffs' claim that centralizing class, *parens patriae*, and individual cases will slow down cases that do not require class certification is easily addressed.  "The Panel frequently centralizes dockets comprising both class actions and individual cases."  *In re JUUL Labs, Inc. Mktg., Sales Practices, and Prods. Liab. Litig.*, 396 F. Supp. 3d 1366, 1367 (J.P.M.L. 2019).  As the Panel's decisions suggest, experienced district judges are quite capable of managing procedural differences among the cases.  For example, if it is even necessary, the transferee judge could schedule a common discovery period, and then have the class claims proceed to class certification while the non-class claims proceed to dispositive motions.  Indeed, Judge Freeman has already begun to organize and manage the various Ad Tech cases before her.  *See* Ex. Y (Digital Ads and Digital Publisher Case Management Order No. 1).

The real issue would seem to be plaintiffs' desire to retain some tactical advantage by having the State AGs' case proceed separately in the Eastern District of Texas.  They do not argue that the State AGs' case is unrelated, nor could they.  Many of the complaints invoke the State AGs' investigation or case.  *E.g.*, Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶¶ 4, 76; Mot. Ex. P (Dkt. No. 1-19) (SPX Compl., No. 21-cv-00801) ¶ 1; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 2, 166; Mot. Ex. K (Dkt. No. 1-14) (Associated Newspapers Compl., No. 21-cv-03446) ¶ 9).  Many plaintiffs have demanded that Google produce all documents that it provided during the State AGs' investigation or that it will produce in the litigation.  Ex. Z (Digital Ads and Digital Publisher First Requests for Production) at 3-4; Ex. AA (SPX Case Management Statement) § 8; Ex. BB (Daily Mail Apr. 30, 2021 Letter) at 2-3. Plaintiffs provide no rationale for having these related cases proceed in multiple courts.  Instead,

they argue that MDL will slow down the State AGs' case, and they would like it to proceed faster. But the plaintiffs exaggerate how far the State AGs' case has progressed, and ignore that the transferee judge can fashion an overall schedule accounting for procedures unique to certain cases.

As a threshold matter, the Eastern District of Texas is not an appropriate forum for centralization.[3]  Although Judge Jordan recently denied Google's motion to transfer under section 1404(a), his decision does not change several critical facts: No defendant is headquartered or even has offices in the Eastern District of Texas.  Not a single plaintiff is located there.  Even the Texas AG does not have an office in the Eastern District of Texas.  Fourteen of the 15 State Plaintiffs are located outside of Texas, as are 58 of the 59 private plaintiffs.  No relevant conduct is alleged to have taken place there.  Not one of Google's many competitors is located in the Eastern District of Texas.  No unique or material third-party witnesses are located there.  No evidence is located there.  The only substantial connections between the State AG case and the Eastern District of Texas have nothing to do with the Ad Tech litigation, but are the personal connections of the Texas Attorney General.  The Texas AG previously served as the state senator for the Texas legislative district covering Collin County, Texas, in which the Eastern District of Texas's Plano courthouse is located; and he recently had a criminal fraud prosecution against him, *State of Texas v. Warren Kenneth Paxton, Jr.*, No. 1555100-3, transferred to Collin County for trial.  *See In re the State of Texas ex rel. Brian W. Wice*, 2021 WL 2149332 (Tex. App. May 27, 2021).  While personal ties may explain the Texas AG's preference for litigating in the Eastern District of Texas, they do not justify centralizing all Ad Tech cases in the Eastern District of Texas.  The better course would be to centralize the cases in a forum that has engaged on the merits of the Ad Tech cases, that hosts

---

[3] Google discusses the plaintiffs' other proposed fora below.

more relevant parties than any other forum, and that has extensive experience in technology antitrust matters.

The fact that the State AGs engaged in a pre-suit investigation does not mean that the cases should be centralized in a jurisdiction otherwise unconnected to the Ad Tech cases.  This Panel has rejected government enforcers' requests for exemption from multidistrict litigation where, despite an earlier government investigation, both the government and the defendant intend to take additional discovery.  *See In re Nat'l Student Marketing Litig.*, 368 F. Supp. 2d 1311, 1317 (J.P.M.L. 1973) (rejecting the SEC's argument that centralizing the enforcement action along with private cases would delay the enforcement action).  Moreover, the State AGs' case is not "light years" ahead of the others.  As recently as March—while Judge Freeman in the Northern District of California began to bring order to the various cases before her—the State AGs substantially amended their complaint, adding 29 pages, 92 paragraphs, five new plaintiffs, and at least 14 new claims.  Plaintiffs' claim that discovery is well underway in the State AG case is exaggerated.  The sum total of discovery requests propounded to date consists of 18 requests for production.  No documents have been produced yet.  No interrogatories or requests for admission have been served. Not a single deposition has been noticed.  Fact and expert discovery will continue for at least another 17 months, and trial is set for June 5, 2023, some *two years* from now.  Ex. CC (State AG Scheduling Order) at 1, 4.  Plaintiffs' suggestion that the States' pre-suit investigation suffices and that no more discovery is necessary is not only untrue, but also directly at odds with the States' position before Judge Jordan and in meet-and-confer discussions with Google.  For example, the State AGs just argued to Judge Jordan that "there should be no limit on requests for production." *See* Ex. JJ (Joint Report of Attorney Conference) at 14.  Judge Jordan's scheduling order permits each side at least 60 depositions, 45 interrogatories and 30 contention interrogatories.  *Id.* at 6-7.

The State AGs did have the benefit of a pre-suit investigation, but they prematurely terminated that investigation and, as a result, still seek to take significant additional discovery in litigation. Regardless of the States AGs' discovery needs, Google has not had the opportunity to take any discovery.  Recognizing that there is much work yet to be done, Judge Jordan set a schedule with a fact-discovery period of over fourteen months, to be followed by expert discovery.  Ex. CC (State AG Scheduling Order) at 1.  While this Panel has declined to centralize a case that has reached or is nearing the end of fact discovery, or that will be tried within months, *see, e.g.*, *In re DietGoal Innovations, LLC ('561) Patent Litig.*, 999 F. Supp. 2d 1380, 1381-82 (J.P.M.L. 2014) (cited in State AGs' Opp. (Dkt. No. 70) at 9) (fact discovery closing one month from the order and trial beginning four months from the order), that is far from the case here.

Even if the Panel were to conclude that one or another case might proceed faster if it were not part of an MDL, such unidentified, incremental acceleration would not outweigh the efficiency and clarity that will come from having a single judge oversee and decide common questions of law and fact and coordinate the same discovery from 19 different cases.  The plaintiffs who proclaim a need for speed (mostly the newspaper plaintiffs) only recently decided to sue over alleged practices that they have known about for many years.  *See, e.g.*, Mot. Ex. K (Dkt. No. 1-14) (Associated Newspapers Compl., No. 21-cv-03446) ¶¶ 85, 96, 102, 113, 121 (complaining about practices that allegedly began in 2008, 2009, 2014, and 2016); Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶¶ 3, 29-30 (discussing a decline in newspaper revenue "since 2006").  The newspapers waited eight months after the first Ad Tech case (the advertisers' case in N.D. Cal., No. 20-cv-03556) was filed to bring their first lawsuit.  Their claims that one case or another might proceed faster on its own is not a reason to impose duplication and risk of inconsistency on all the other parties, third parties, and the courts.  All of these cases are in their

early stages, and no plaintiff has sought a preliminary injunction.  These cases do not need to hurtle

forward in 16 different courts.

Having addressed the plaintiffs' timing arguments, it is clear that centralizing all of these

cases would promote both legal clarity and efficiency for the parties and the courts.[4]

### B.    The cases all present common legal, liability, and damages questions; centralization will avoid duplication and conflicting rulings.

No plaintiff addresses one of the most important reasons to centralize these cases: the need

to avoid duplication and inconsistent rulings.  Without centralization, duplication and the risk of

inconsistent rulings will arise for issues including market definition, whether the alleged conduct

in fact violated antitrust law, and the existence and apportionment of any damages.

*Market Definition.*    Centralization will avoid duplication of effort, and potentially

conflicting rulings on market definition.   Antitrust market definition will be a central, and

potentially dispositive, issue in every one of the Ad Tech cases.  In all of these cases, the presiding

court will have to define the relevant antitrust market, both to assess whether a defendant has the

requisite market power or potential to obtain it (Section 2 claims) and to assess the alleged effects

of the challenged practices or agreements to determine whether they have an anticompetitive effect

in the relevant market (both Section 2 and Section 1 claims).[5]

---

[4] Cliffy Care Landscaping also argues that its case would be slowed if its supposedly straightforward Section 1 case was centralized with cases that included monopolization allegations.  That argument does not address the 14 other cases that do include the same Section 1 claim.  Moreover, Cliffy Care's factual allegations also mirror those in the pure Section 2 cases, even if the sections of the Sherman Act invoked differ. *See, e.g.*, Ex. DD (Cliffy Care Consolidated Compl.) ¶ 41 (allegations about waterfalling); ¶ 42 (allegations of competition from header bidding); ¶ 45 (allegations regarding "last look"); ¶¶ 47-48 (allegations that Google's response to header bidding, Open Bidding, was unfair).

[5] Cliffy Care Landscaping suggests that market definition is unnecessary in its case, but the Supreme Court squarely rejected that argument in *Ohio v. American Express*, 138 S. Ct. 2274, 2284-85 (2018) (while "plaintiffs rely exclusively on direct evidence to prove . . . anticompetitive

The plaintiffs, like Associated Newspapers, who emphasize that different plaintiffs have pleaded different relevant markets miss the point. The fact that different plaintiffs have pleaded different—and mutually exclusive—relevant markets when challenging the same conduct and claiming the same anticompetitive effects is the most vivid demonstration as to why allowing these cases to proceed separately would risk conflicting rulings. The plaintiffs who claim that the relevant market is "digital advertising," or "display Ad Tech," or smaller markets consisting of Ad Tech components cannot each be correct; yet asking 18 different judges to engage in the market-definition analysis poses the very real risk that they will reach inconsistent conclusions.

The market-definition issues unique to this case further counsel in favor of centralization. While some plaintiffs argue that organizing advertisers, newspaper internet publishers, other internet publishers, and state residents into a set of coordinated cases will complicate things, all of these interest groups must be considered in each of the cases anyway. Google expects to argue that Ad Tech is a two-sided transaction platform under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018). Some plaintiffs have admitted as much. *See* Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶ 41 ("'Third-party display ad tech platforms' are run by intermediary vendors and facilitate the transaction between third-party advertisers and third-party publishers."); Ex. HH (Digital Ads Mot. for Appointment of Lead Counsel) at 2 ("publishers and advertisers square off at opposite ends of a buy-sell transaction, a transaction in which publishers push for higher prices and advertisers seek to pay less"); Ex. II (Digital Ads Application for Appointment as Interim Lead Counsel) at 5 ("the reason publishers and advertisers use Google's services is to connect them with participants on the other side"). When defining a relevant market for two-sided transaction platforms, "courts must include both sides of the platform." *Ohio v. AmEx*, 138 S. Ct.

---

effects in the credit-card market[, t]o assess this evidence, we must first define the relevant market" and determine whether the market is, in fact, two-sided).

at 2286; *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided transaction platforms, the relevant market must, as a matter of law, include both sides of the platform.").  In *Ohio v. AmEx* the two sides were merchants and cardholders; in this case they are advertisers and publishers.  When assessing whether the challenged conduct had an anticompetitive effect, a court must consider the effects on the two-sided market *as a whole*, rather than looking at the effects on just one side.  *Ohio v. AmEx*, 128 S. Ct. at 2287.  Here, that means that a court must look at the effects on both advertisers and publishers, and on the larger ecosystem.  For example, if Google's conduct had the effect of lowering the prices that advertisers paid for ad space on publisher properties, that might be bad for publishers but good for advertisers. On the other hand, Google's conduct allegedly "policing malicious code" (*see* Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 137-39) might benefit publishers by making their sites safer but result in some advertisers' creative not being shown.  In either situation, Google's attempt to balance the interests of parties on both sides of the equation, while promoting the overall health of the ad-supported internet for end users, could attract complaints from one or the other side of the marketplace.  But the question before the court will be whether Google's conduct had a negative effect on competition in the market *as a whole*.  Thus, contrary to some plaintiffs' arguments that the different plaintiffs should not be coordinated because their interests diverge, coordination would be more efficient because whatever court addresses this marketplace will need to consider all of the conflicting interests in every case.

Even leaving aside the two-sided-market question, the cases present other overlapping (and therefore potentially conflicting) questions as to which competitors should be included or excluded from the relevant market.  Not surprisingly, several plaintiffs attempt to exclude from their relevant market Ad Tech for closed web properties like Facebook and Amazon (*see, e.g.*, Mot. Ex. N (Dkt.

No. 1-17) (Emmerich Newspapers et al. Compl., No. 21-cv-00274) ¶¶ 101-06; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 204-06; Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶ 169), while others contend that Google and Facebook compete in Ad Tech.  Plaintiffs also take inconsistent positions as to whether directly negotiated transactions between advertisers and publishers are in the market (*compare* Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 192-93 *with* Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶ 165 *and* Mot. Ex. K (Dkt. No. 1-14) (Associated Newspapers Compl., No. 21-cv-03446) ¶ 64).  Judge Freeman in the Northern District of California was "particularly concerned that [the advertiser] Plaintiffs' market excludes social-media display advertising and direct negotiations."  Ex. EE (Digital Ads MTD Order) at 6.  Other cases present this same concern.

*Conduct allegations.*  The plaintiffs' conduct allegations also overlap massively.  Without centralization, multiple courts would be asked to decide whether the same conduct allegations can support an antitrust claim as a matter of law.  Judge Freeman has already provided an initial answer to some of these questions in ruling on Google's motion to dismiss a first complaint; no other court has engaged substantively with the allegations in these cases.  Asking other courts to decide the same questions regarding the same conduct only risks inconsistency.  Common conduct allegations include:

- "Monopoly leveraging," or the theory that Google is trying to use its alleged dominance in search to gain a monopoly in Ad Tech; *see, e.g.*, Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶ 64; Mot. Ex. N (Dkt. No. 1-17) (Emmerich Newspapers et al. Compl., No. 21-cv-00274) ¶ 74; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶ 134; Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶ 178;

- "Tying," or the theory that Google improperly bundled together its ad server and ad exchange functionalities; *see, e.g.*, Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶ 119; Mot. Ex. K (Dkt. No. 1-14) (Associated

Newspapers Compl., No. 21-cv-03446) ¶ 81; Mot. Ex. P (Dkt. No. 1-19) (SPX Compl., No. 21-cv-00801) at ¶¶ 60-61; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶ 122; Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶ 123;

○   Allegations that Google designed auction formats to advantage Google's ad exchange; *see, e.g.*, Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶ 237; Mot. Ex. P (Dkt. No. 1-19) (SPX Compl., No. 21-cv-00801) at ¶ 80; Ex. DD (Cliffy Care Consolidated Compl.) ¶ 45; Mot. Ex. K (Dkt. No. 1-14) (Assoc. Newspapers et al. Compl., No. 21-cv-03446) ¶ 42; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 137-38; Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶ 88;

○   Allegations that Google's long-ago-completed acquisitions of Ad Tech companies were anticompetitive; *see, e.g.*, Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶¶ 54, 98; Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶¶ 7, 43, 143, 145; Mot. Ex. N (Dkt. No. 1-17) (Emmerich Newspapers et al. Compl., No. 21-cv-00274) ¶¶ 64, 108; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 60-61; Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶¶ 80-87;

○   Allegations that Google should, but does not, provide certain information about auctions or bids to competitors or auction participants; *see, e.g.*, Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶ 45; Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶¶ 142, 145-46; Mot. Ex. N (Dkt. No. 1-17) (Emmerich Newspapers et al. Compl., No. 21-cv-00274) ¶ 55; Mot. Ex. P (Dkt. No. 1-19) (SPX Compl., No. 21-cv-00801) at ¶ 66; Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶¶ 140-41, 146-52; Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶¶ 153-57, 174, 178;

○   Allegations that the agreement between Google and Facebook affected the prices advertisers pay for space or the price that publishers receive for it. *See, e.g.*, Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) ¶¶ 76, 85-87; Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶¶ 218, 231; Mot. Ex. N (Dkt. No. 1-17) (Emmerich Newspapers et al. Compl., No. 21-cv-00274) ¶¶ 86, 95-97; Mot. Ex. P (Dkt. No. 1-19) (SPX Compl., No. 21-cv-00801) at ¶¶ 113-14; Ex. DD (Cliffy Care Consolidated Compl.) ¶ 49.

Some plaintiffs argue that every complaint does not include every single allegation.  Others offer varying characterizations of some conduct and the legal theories into which they fit that conduct. But no plaintiff seriously disputes that every case centers around the same core products, the same core alleged conduct, and the same alleged anticompetitive effects.  The common issues and

allegations overwhelm the unique ones.   To illustrate, Google has corrected the chart that Associated Newspapers attached to its brief, adding in additional overlapping allegations that Associated Newspapers omitted.  Ex. FF (Corrected Version of Associated Newspapers, Ex. A).

*Damages*.  Allowing class, *parens patriae*, and individual cases that all seek damages from the same pot to proceed in different jurisdictions risks conflicting damages apportionments.   In every case, the plaintiffs claim that they either paid too much for advertising or received too little from it, and they seek to make up the difference out of Google's Ad Tech revenue.   The newspaper plaintiffs, for example, claim that Google takes too large of a cut of their advertising revenues: "Google was able to extract a supracompetitive share of Plaintiff's ad revenues."  Mot. Ex. A (Dkt. No. 1-4) (Clarksburg Publishing Compl., No. 21-cv-00051) ¶ 102.   The publisher class representatives allegedly "paid artificially inflated fees directly to Google."  Mot. Ex. S (Dkt. No. 10-2) (Digital Publisher Compl., No. 20-cv-08984) ¶¶ 22-28.   On the other side, advertisers likewise claim that Google's fees to them are too high.  Mot. Ex. R (Dkt. No. 10-1) (Digital Ads FAC, No. 20-cv-03556) ¶ 3.   While neither side's claim is true, both publishers and advertisers seek to recover more of the overall revenue generated by transactions that Google's Ad Tech business helps to enable.

The same is true with respect to the Google-Facebook agreement.   Although many plaintiffs challenging that agreement do not articulate how they claim to have been damaged, all allege that the agreement distorted the outcome of Google advertising auctions.  *See* Newspapers' Opp. (Dkt. No. 68) at 9; Cliffy Care Opp. (Dkt. No. 79) at 3-4; Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶ 218; Mot. Ex. P (Dkt. No. 1-19) (SPX Compl., No. 21-cv-00801) at ¶¶ 113-14.   Consequently, whatever damages plaintiffs ultimately seek concerning the

Google-Facebook agreement claims, they will again be seeking to recover from the same pot: the revenue generated by Google's Ad Tech business.

Allowing these many cases to proceed independently risks not only inconsistent damages theories but also duplicative recoveries.  The putative classes all include citizens of the states that are also suing for damages.  The publishers' putative class includes all of the newspaper plaintiffs. The advertisers' putative class overlaps with the *Cliffy Care* class.  While Cliffy Care took pains to argue that its liability theory differs from those in the *Digital Advertising* complaint, both classes seek to recover the amount that the same plaintiffs allegedly overpaid Google for buying the same digital advertisements; one cannot expect that single alleged overcharge to be apportioned among slightly different theoretical causes advanced by the same advertiser plaintiffs in different district courts.

C.  **The cases require significantly overlapping fact discovery; centralization will save party and witness resources, and save multiple courts from having to rule on the same discovery disputes.**

The overlapping market-definition, conduct, and damages questions mean that all of the cases will generate significantly overlapping discovery.  Obviously the cases will require duplicative discovery from Google, since the same Google products and services are at issue in each case.  Similarly, the cases will all require discovery from Facebook, either because of the Google-Facebook agreement or because Facebook is a key competitor in any properly defined Ad Tech relevant market.  The plaintiffs do not dispute that every case will require discovery of the same products, the same potential or actual competitors, and the same market participants.  What's more, each case will likely require discovery of the plaintiffs in the other cases.  For example, the publisher class will need discovery of the newspapers who, according to Associated Newspapers, are the publishers most affected by and most knowledgeable about Google.  Under a two-sided

market analysis requiring plaintiffs to demonstrate harm to the market as a whole, the publishers will need to show harm to the advertisers and vice versa; the State AGs will need to show harm to both.

The plaintiffs' main argument on discovery is there are no efficiencies to be gained because discovery in the State AG case is nearly complete. That argument is incorrect. As detailed above, discovery has barely begun in the State AG case, and will continue through at least November 2022. While the State AGs may have a head start, Google has not had the opportunity to take any discovery, and Google will require much of the same third-party discovery across all cases.

**D.      Plaintiffs' pleas for informal coordination or a wait-and-see approach are illusory and impractical.**

Some plaintiffs claim they will informally coordinate, or they criticize Google for not waiting to see if there are, in fact, duplicative discovery requests and inconsistent rulings. This argument proves too much: if this Panel were to wait until promised informal coordination among seven plaintiffs' groups inevitably breaks down, many of centralization's benefits would be lost. The multidistrict litigation centralization process was created to ensure that related cases scattered across the country would be coordinated efficiently. Moreover, plaintiffs' abstract promises to coordinate come with no practical proposals as to what that might look like and, significantly, no suggestion that this coordination would avoid inconsistent rulings or lead to any meaningful streamlining or efficiencies. For example, some plaintiffs claim that they could file deposition notices in every case. Similarly, the advertiser plaintiffs suggest that "relevant discovery already completed should ordinarily be made available to litigants in the other cases." Advertiser Opp. (Dkt. No. 78) at 4. Both of these suggestions appear to be proposals that plaintiffs get access to discovery from other cases, without any commitment not to duplicate that discovery. In a case like this one, where many of the attorneys will be looking to justify their share of a recovery by

pointing to what they did, not the effort they saved, the courts should not hope for voluntary and informal cooperation.

Other plaintiffs point out that the advertiser and publisher class plaintiffs have been coordinating discovery in the Northern District of California. But they have done this because the cases are pending before a single judge and that judge *ordered* them to coordinate. Ex. GG (Digital Ads and Digital Publisher Order Establishing Discovery Committee). Thus, the class plaintiffs' discovery committee is an example of efficiencies that result from having a single judge oversee multiple cases, not of hoping for informal cooperation across district courts.

The Panel also does not need to wait and see if there are alternatives to transfer under Section 1407. Judge Jordan has rejected transfer in the State AG case, so "[t]ransfer under Section 1404(a) is no longer a viable alternative to centralization." *In re Capacitors Antitrust Litig. (No. III)*, 285 F. Supp. 3d 1353, 1355 (J.P.M.L 2017) (centralizing cases after a 1404 transfer motion was denied). No plaintiff has suggested they would agree to a 1404 transfer, and all currently insist that they should stay in their chosen fora. *See In re Schnuck Markets, Inc. Litig.*, 978 F. Supp. 2d 1379, 1381 (J.P.M.L. 2013) (noting that recent decisions denying centralization in favor of Section 1404 motions involved fewer than four districts "and/or indications from counsel that they were amenable to Section 1404 transfer"). And, in any event, it would not be efficient to ask 14 different district courts to adjudicate individual transfer motions when the need for centralization is already clear.

**E.      Plaintiffs' other arguments against centralization are unavailing.**

Plaintiffs collectively make three other arguments against centralization, all of which are really attempts to *ensure* duplication by keeping the State AG case separate.

*First*, plaintiffs argue that Judge Jordan's decision denying Google's motion to transfer should dictate the overall result of this MDL petition. It should not. The standards for 1404 transfer and 1407 centralization are different. *See, e.g.*, *In re Radioshack Corp. "Erisa" Litig.*, 528 F. Supp. 2d 1348, 1349 (J.P.M.L. 2007). While Judge Jordan did not conclude that the Northern District of California was the "clearly more convenient forum" for the State AG case, that conclusion sheds no light on the standard applicable here. It does not mean that centralization is inappropriate or that the Northern District is an improper forum for the multidistrict litigation as a whole. Indeed, Judge Jordan found "the central allegations in the cases pending against it in the Northern District of California mirror the core allegations of the Plaintiff States here," Ex. X (State AG Transfer Order) at 15, and that the claims of the private actions and the State AG action are "premised on the same underlying theories concerning Google's alleged anticompetitive conduct." *Id*. at 17. Those findings are far closer to the standard for centralization applicable under Section 1407.

*Second*, some plaintiffs point to a recently proposed bill that, if passed by Congress, would alter 45 years of MDL practice and exclude state antitrust *parens patriae* actions from Section 1407. When Congress gave the states the right to sue for damages under the Clayton Act, the very same bill provided that those damages actions would be subject to Section 1407. Pub. L. 94–435, § 303, 90 Stat. 1396 (1976) (adding 28 U.S.C. § 1407(h)). Thus, the states' right to sue for damages under federal antitrust law has always come with the possibility of centralization with other, similar actions. The new proposed bill is not law, does not demonstrate any Congressional intent, and has not altered this Panel's current jurisdiction or the factors the Panel must consider.[6] If anything,

---

[6] Were the legislation (which has not been the subject of Congressional hearing or of comments from the Federal Judiciary or the Advisory Committee) to pass, it could well present due-process and separation-of-powers issues as applied to pending matters, which would have to be assessed.

the existence of the bill suggests a recognition by at least some members of Congress that current law supports centralization.

*Third*, the State AGs argue that there should be no MDL because Google sought to arbitrate claims by some of the advertiser plaintiffs.  Judge Freeman denied that motion, so there are no cases currently in arbitration.  Moreover, Google's invoking its right to have some claims resolved in arbitration is completely consistent with the overall goal of resolving this dispute as efficiently as possible.  Moving some cases to individual arbitration where legally appropriate would reduce costs because arbitration is generally less expensive and requires less costly discovery than federal court litigation, especially class litigation.  Individual arbitrations do not carry the same risk of inconsistent federal court rulings because the proceedings are individual and their collateral-estoppel effect is limited.  Moving some cases to arbitration would certainly save *judicial* resources because arbitration requires no judicial resources at all.

**F.     The Northern District of California is the most logical forum for this litigation.**

Google (and Facebook) suggest the Northern District of California because that jurisdiction hosts the first-filed case,[7] the most advanced case, hosts the most cases in total, is the only district that houses multiple parties, and is the candidate jurisdiction with the most experience in technology and antitrust cases like this one.

---

[7] Some plaintiffs claim that the Northern District of California does not host the first-filed case because another case, *Inform v. Google*, was filed earlier in Georgia.  However, *Inform* is irrelevant to this petition.  First, no party alleges that *Inform* should be part of any Ad Tech MDL, so *Inform*'s filing date is irrelevant.  Further, Google disagrees that the *Inform* case is sufficiently related to merit centralization.  Whereas the Ad Tech cases focus on alleged anticompetitive conduct and effects in display Ad Tech, *Inform*'s only theory of harm is that Google harmed advertisers by transitioning its Chrome browser from Flash to HTML5, a minor issue almost wholly unrelated to claims in the other cases.

Judge Freeman in the Northern District is the only judge who has engaged significantly on any of the cases' merits and is up-to-speed on the relevant issues.  She issued a detailed ruling on Google's motion to dismiss the advertiser plaintiffs' already-once-amended complaint and considered market definition and conduct-liability issues.  In doing so, she has already begun to formulate a framework for organizing the handling of the various cases before her.  In contrast, other courts have entered protective orders or case schedules but have not yet had to tangle with the substantive legal issues.  While some plaintiffs speculate as to the reasons that others filed their cases in the Northern District, the fact remains that the district hosts more Ad Tech cases than any other one.  The Northern District plaintiffs support centralization there (if anywhere).  The Northern District is also home to all defendants and one plaintiff, while no other candidate jurisdiction (other than West Virginia and Delaware, which no party suggest) is home to multiple parties.

The States have not shown that any other district is preferable.  They have not identified any connection between this case and the Eastern District of Texas, other than the State AGs' choice of that forum.  They concede that *none* of the relevant events took place in the Eastern District of Texas, no relevant witness is located there, and no resident of the Eastern District of Texas suffered any unique or specific harm.  Plaintiffs argue in the abstract that the Eastern District of Texas is "central" or "convenient," but it is no more central than any other district in Texas or elsewhere near the middle of the country.  They tout the Eastern District of Texas's proximity to an airport, but Judge Freeman's courtroom in the Northern District of California is less than five miles from San Jose International Airport.  They claim that the median time to disposition is shorter than the Northern District of California, but Judge Jordan has already set a trial date that would exceed the Eastern District of Texas's median time to disposition and trial.  Median case statistics,

which may be driven by the case mix and average case complexity in a particular jurisdiction, are not particularly useful when considering antitrust cases that are far more complicated than the "median" case.

A subset of the plaintiffs also suggests centralization in the Southern District of New York. While that location might be more convenient for some of the newspaper plaintiffs (and their non-party industry groups), the Panel must consider all of the parties and the litigation as a whole. Although several plaintiffs analogize Google's Ad Tech services to a financial exchange (*see, e.g.*, Mot. Ex. B (Dkt. No. 1-5) (HD Media Compl., No. 21-cv-00077) at ¶ 45; Mot. Ex. G (Dkt. No. 1-10) (State AG Compl., No. 20-cv-00957) at ¶¶ 5-6), the specialized world of financial regulation has nothing to do with the technology and antitrust issues in this case.

The District Court for the District of Columbia is also an inappropriate transferee forum. No party resides in Washington, D.C. (not even the plaintiffs that filed cases there). The antitrust case that plaintiffs mention, *United States v. Google*, does not concern the display advertising technology at issue in the instant cases. This Panel has previously rejected attempts to use *United States v. Google* as an anchor to transfer one of the Ad Tech complaints to D.C. *See* Mot. Ex. W (Dkt. No. 1-26) (*In re Google Play Store Antitrust Litig.*, MDL No. 2981 Dkt. No. 89 (J.P.M.L. Feb. 5, 2021)).

G.    **Conclusion**

For these reasons, Google respectfully requests that the Panel transfer the Ad Tech cases for coordinated or consolidated proceedings in the Northern District of California before the Hon. Beth Labson Freeman.

Dated: June 2, 2021                          Respectfully submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2197
Facsimile: (415) 947-2099
Email: jsessions@wsgr.com

Jonathan M. Jacobson
Michael S. Sommer
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7758
Facsimile: (212) 999-5899
Email: jjacobson@wsgr.com
Email: msommer@wsgr.com

Eric Mahr
Julie S. Elmer
FRESHFIELDS BRUCKHAUS DERINGER LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4545
Facsimile: (202) 777-4587
Email: eric.mahr@freshfields.com
Email: julie.elmer@freshfields.com

Boris Feldman
FRESHFIELDS BRUCKHAUS DERINGER LLP
2710 Sand Hill Road
Menlo Park, California 94025
Telephone: (650) 461-8200
Email: boris.feldman@freshfields.com

*Counsel for Defendants Google LLC, Alphabet Inc.,*
*and YouTube, LLC*