ADRMOP

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:21−cv−06011−LB

SkinnySchool LLC et al
Assigned to: Magistrate Judge Laurel Beeler
Cause: 15:1 Antitrust Litigation

Date Filed: 08/03/2021
Jury Demand: Plaintiff
Nature of Suit: 410 Anti−Trust
Jurisdiction: Federal Question

**Plaintiff**

**SkinnySchool LLC**
*doing business as*
Maria Marques Fitness

represented by **Pamela Ann Markert**
Cera LLP
595 Market Street Suite 1350
San Francisco, CA 94105
415−977−2228
Email: pmarkert@cerallp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Solomon B. Cera**
Cera LLP
595 Market Street, Suite 1350
San Francisco, CA 94105−2835
(415) 777−2230
Fax: (415) 777−5189
Email: scera@cerallp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mint Rose Day Spa LLC**
*on behalf of themselves and all others
similarly situated*

represented by **Pamela Ann Markert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Solomon B. Cera**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/03/2021 | 1 | COMPLAINT *Class Action Complaint* against Google LLC ( Filing fee $ 402, receipt number 0971−16246952.). Filed bySkinnySchool LLC, Mint Rose Day Spa LLC. (Attachments: # 1 Civil Cover Sheet)(Markert, Pamela) (Filed on 8/3/2021) (Entered: 08/03/2021) |
| 08/03/2021 | 2 | Proposed Summons. (Markert, Pamela) (Filed on 8/3/2021) (Entered: 08/03/2021) |
| 08/04/2021 | 3 | Case assigned to Magistrate Judge Laurel Beeler. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E−Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. |

| | | |
|---|---|---|
| | | Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5−1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 8/18/2021. (anjS, COURT STAFF) (Filed on 8/4/2021) (Entered: 08/04/2021) |
| 08/04/2021 | 4 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 10/28/2021. Initial Case Management Conference set for 11/4/2021 11:00 AM. (mclS, COURT STAFF) (Filed on 8/4/2021) (Entered: 08/04/2021)** |
| 08/04/2021 | 5 | Summons Issued as to Google LLC. (mclS, COURT STAFF) (Filed on 8/4/2021) (Entered: 08/04/2021) |

SOLOMON B. CERA (Bar No. 099467)
PAMELA A. MARKERT (Bar No. 203780)
CERA LLP
595 Market St., Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Fax: (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

*Attorneys for Plaintiffs and the Class*
*[Additional Counsel listed on Signature Page]*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SKINNYSCHOOL LLC d/b/a MARIA MARQUES FITNESS and MINT ROSE DAY SPA LLC, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>      vs.<br><br>GOOGLE LLC,<br><br>               Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page(s)

I. NATURE OF THE CASE ......................................................................................... 1

II. PARTIES .................................................................................................................. 2

III. JURISDICTION ....................................................................................................... 3

IV. VENUE .................................................................................................................... 3

V. INDUSTRY BACKGROUND .................................................................................. 4

    A. Market Participants ....................................................................................... 4

    B. Online Display Advertising Markets ............................................................. 5

        1. Ad Servers ......................................................................................... 5

        2. Electronic Marketplaces for Display Advertising: Exchanges and Networks ........................................................................................... 7

        3. Ad Networks for Display and Ad Networks for Mobile In-App Inventory ......... 7

VI. GOOGLE'S MARKET POWER ............................................................................... 7

VII. ANTICOMPETITIVE CONDUCT ........................................................................... 8

    A. Google forces publishers to trade in Google's ad exchange ............................ 8

    B. Header Bidding: A threat to Google's dominance which Google eliminated by its agreement with Facebook ............................................................................. 9

    C. The Illegal Facebook Agreement .................................................................. 11

VIII. ANTICOMPETITIVE EFFECTS ............................................................................. 14

    A. Anticompetitive Consequences of the Facebook Agreement ........................ 14

IX. CLASS ACTION ALLEGATIONS .......................................................................... 15

X. CLAIM FOR RELIEF ............................................................................................. 17

XI. PRAYER FOR RELIEF ........................................................................................... 17

XII. DEMAND FOR A JURY TRIAL ............................................................................. 18

1.      SkinnySchool LLC d/b/a Maria Marques Fitness and Mint Rose Day Spa LLC ("Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following against Google LLC ("Google" or the "Defendant") based upon information and belief as to the investigation conducted by Plaintiffs' counsel, which included, among other things, the Complaint filed by the Attorney General of the State of Texas and nine other States Attorneys General in the United States District Court for the Eastern District of Texas (4:20cv957) on or about December 16, 2020, and several reports in the press including *The Wall Street Journal* and *The New York Times* as late as January 18, 2020.

2.      Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth in this Class Action Complaint.

## I.      NATURE OF THE CASE

3.      Google has achieved dominance by control over the overwhelming amount of advertising sold on its advertising exchange and sought to suppress competition and protect its position through a multitude of exclusionary tactics, including an unlawful agreement with Facebook, Inc. ("Facebook").

4.      Plaintiffs file this Complaint as a class action on behalf of advertisers on Facebook who were victimized by the unlawful agreement between Google and Facebook (the "Class"). Google is responsible for all the damages incurred by the Class because of the aforementioned unlawful agreement and its concentration of power with advertising exchanges, described below in Section VII., Google's agreement with Facebook, its largest potential competitive threat, allowed Google to manipulate advertising auctions on the advertising exchange, as further detailed in these allegations.

5.      Google and Facebook are, among other things, advertising companies, each of which makes billions of dollars a year by using individuals' personal information to sell targeted digital advertising to their clients – the Class.

6.      At its inception, one of Google's primary sources of income was from advertising on its search platform.  It has since extended its reach to dominate the online advertising landscape for image-based web display ads, including advertising exchanges.

7.      The purchase and sale of advertising on the web is among the most  complicated financial markets. Publishers and advertisers trade display inventory through a variety of intermediaries on

electronic exchanges at lightning speed.

8. In 2018, Google generated more than $116 billion in the digital advertising business, approximately 85% of its total revenue.

9. Nearly all persons or entities that have space to sell for advertising online (referred to in this complaint as publishers), regardless of their size, depend on Google to sell their online display ad space in their "ad exchanges," i.e., the centralized electronic trading venues where display ads are bought and sold.

10. Conversely, nearly every consumer goods company, e-commerce entity, and small business now depends on Google as its middleman for purchasing display ads from Google's exchange to market its goods and services to consumers.

11. In addition to representing both the buyers and the sellers of online display advertising, Google also operates the largest exchange, an electronic advertising market, for which Google is the gate keeper ("AdX").

12. To protect its position across online display markets, Google has repeatedly violated the federal antitrust laws. Google uses its powerful position on every side of the online display market to unlawfully exclude competition. When Google's market power was threatened, it cut off innovation and competition through an agreement with Facebook, as described in these allegations (the "Facebook Agreement").

13. Through Google's anticompetitive conduct and its unlawful agreement with Facebook, Google has violated and continues to violate Section 1 of the Sherman Act, 15 U.S.C. §§ 1, et seq.

## II. PARTIES

14. Plaintiff SkinnySchool LLC d/b/a Maria Marques Fitness ("SkinnySchool") is a limited liability company organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in North Billerica, Massachusetts. SkinnySchool, a purchaser of display advertisements on Facebook, brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15. Plaintiff Mint Rose Day Spa LLC ("Mint Rose") is a limited liability company organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business

in Billerica, Massachusetts. Mint Rose, a purchaser of display advertisements on Facebook, brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

16. Defendant Google is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California.

17. Google is a wholly-owned subsidiary of Alphabet Inc. Alphabet Inc. is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.

18. Google is an online advertising technology company best known for its popular search engine. Google additionally offers many internet-related products, including various online advertising technologies, directly and through subsidiaries and business units under its ownership and control.

### III. JURISDICTION

19. Plaintiffs bring this class action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to: (a) recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; (b) enjoin Defendants' anticompetitive conduct; and (c) obtain any other relief afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

21. This Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which states that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

### IV. VENUE

22. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26) and 28 U.S.C. §§ 1391. At all times relevant to the Complaint, Google has been headquartered in and has its principal place of business in this District and a substantial part of the conduct giving rise to this action occurred in this District.

## V.    INDUSTRY BACKGROUND

23.    Display ads, audio ads, and video ads in the online world have largely supplanted their traditional print, radio, and television counterparts. The internet ushered in completely new advertising formats, including targeted text-based ads on search engines, shareable ads on social media, and specialized ads inside mobile phone applications. With those new formats came new opportunities to efficiently reach particular customers with targeted digital advertising.

### A.    Market Participants

24.    Broadly speaking, digital advertising can be divided primarily into the distinct categories of search, display, and video advertising.

25.    Search advertising refers to ads which appear among the results of an internet search. Because advertisers choose to display their ads for certain keywords, search ads can be targeted to consumers likely to purchase the goods or services advertised.

26.    Display advertising refers to ads which appear on websites or apps alongside content. The ads may take a variety of forms, including banners and sponsored content. For example, the New York Times runs banner ads at the top of their homepage and atop and within articles.

27.    Video advertising is closely related to display advertising, and at times a form of display advertising.

28.    For online publishers and advertisers alike, the different online advertising formats are not interchangeable. For example, online media companies that operate websites and mobile applications are restricted by their platform's coding on the types of ad formats they can sell.

29.    At the same time, advertisers (looking to place ads on the publisher's platform) purchase advertising space in one format or another to serve their distinct goals. Search advertising allows companies to reach consumers who have demonstrated a likelihood of interest in their products or services, not only by their use of keywords but also through their previous browsing history, demographic information, or location. Advertisers and ad agencies regard search advertising as a tool to directly lead to sales, while they intend display advertising as a tool for gaining exposure to new consumers and brand building. In other words, search and display advertising fulfill different functions, and neither is a substitute for the other.

30.    In addition to introducing new advertising formats, the internet changed how publishers sell their advertising inventory. Online publishers sell their inventory to advertisers either directly or indirectly through ad exchanges.

31.    The "direct" sales method refers to campaigns that the publisher itself sells directly to advertisers, including those campaigns sold by the publisher's internal sales staff.

32.    The reality of most digital advertising transactions is more complex, with an array of intermediaries facilitating the placement of ads. Publishers use a specialized distribution channel to sell their ad inventory *indirectly* to advertisers. "Indirect" sales occur through centralized electronic trading venues called "ad exchanges."  Publishers use ad exchanges to auction their inventory in real time on their behalf and keep a portion of advertising proceeds in return.

33.    Because publishers can target ads to specific users in real time, online publishers manage highly varied, or "heterogeneous," inventory.

34.    Since publishers can target ads to a specific user instead of buying and selling just one advertisement of a specific webpage, they can buy and sell tens of thousands of advertisements.

35.    For example, if a webpage has three available spots for an advertisement there are not three spots available but three times "x" spots available, where "x" is the number of unique individuals viewing the website. This allows for tens of thousands or hundreds of thousands of unique advertisements per webpage.

**B.    Online Display Advertising Markets**

36.    Online publishers and advertisers depend on several different and distinct products to sell their display inventory. These products include (a) the ad server, which acts as the publisher's inventory management system and helps the publisher sell its inventory, (b) the marketplaces that match buyers and sellers of display ads (exchanges and networks, separately), and (c) the ad buying tools that advertisers must use as their middleman to buy display inventory from exchanges. These products conduct the complex tasks associated with pricing, clearing, executing, and settling billions of display impressions every month in the United States. Google possesses market power in each of these distinct areas.

**1.    Ad Servers**

37.    Publishers depend on sophisticated inventory management systems called ad servers to

CLASS ACTION COMPLAINT

holistically manage their online display inventory. Ad servers keep track of publishers' heterogeneous ad inventory and help publishers sell that inventory, with the stated goal of maximizing publishers' advertising revenue. Publishers typically use a single ad server to manage all their display inventory; using multiple ad servers would substantially frustrate a publisher's ability to effectively optimize management of their inventory and maximize revenue.

38.     The ad server performs critical tasks related to selling ad space. The ad server identifies the users visiting the publisher's webpage to manage the publisher's inventory and maximize its yield by allowing the advertiser to know the ad space targeted to that user is high value. As the middleman between a publisher and exchanges, the ad server controls how different exchanges, and even networks, can access and compete for a publisher's inventory.

39.     Because the ad server sits between a publisher and the publisher's sales channel, the ad server can obstruct competition between the multiple exchanges competing for publishers' impressions in multiple ways.

40.     Despite the relative complexity of ad servers, prior to Google's entrance into the publisher ad server market, ad servers were "a commodity good." They charged publishers a low cost-per-impression rate or a monthly subscription price for the total number of ad impressions managed and served.

41.     In 2008 Google acquired DoubleClick, the leading provider of the ad server tools that online publishers, including newspapers and other media companies, use to sell their graphical display-advertising inventory on exchanges, for $3.1 billion.

42.     As the new intermediary between publishers and exchanges, Google quickly began to use its new position to exert leverage.

43.     Google was able to demand that it represent the buy-side, where it extracted one fee, as well as the sell-side, where it extracted a second fee, and it was able to force transactions to clear in its exchange, where it extracted a third, even larger, fee.

44.     Google has successfully controlled the publisher ad server market and grown its ad exchange to the largest in the United States, despite having entered this market much later than the competition. Now, in part as a result of its purchase of DoubleClick, Google controls the publishers' ad

CLASS ACTION COMPLAINT

server market for display inventory through its Google Ad Manager ("GAM") product.

**2.  Electronic Marketplaces for Display Advertising: Exchanges and Networks**

45.  The vast majority of online publishers in the United States at present sell at least some of their inventory to advertisers through advertising marketplaces: ad exchanges and, similarly but on a smaller scale, ad networks. GAM controls over 90 percent of commerce on ad exchanges in the United States.

46.  Display Ad exchanges are real time auction marketplaces that match multiple buyers and multiple sellers on an impression-by-impression basis. A publisher's ad server can route the publisher's inventory to such exchanges in real time as users load webpages. These exchanges then connect with advertisers through their respective intermediaries.

47.  Google compares its ad exchange – AdX – to financial exchanges like the NYSE and Nasdaq.

48.  Ad exchanges charge publishers a share of transaction value, which is currently 5 to 20 percent (or more) of the inventory's clearing price.

**3.  Ad Networks for Display and Ad Networks for Mobile In-App Inventory**

49.  Facebook also has a significant online presence in the United States and is an advertiser to its tens of millions of users. Publishers and advertisers can also advertise on the Facebook platform as a means of directing advertisements to Facebook users. As the two largest online advertisers in the United States, Google and Facebook are direct competitors.

50.  Essentially every major website and almost every mobile application sells their inventory in AdX and its ad networks for display and mobile in-app ads.

51.  As a result, competition on the buy-side among the intermediaries that serve advertisers depends on access to Google's exchange and networks.  Google is *the* bottleneck between publishers and advertisers.

52.  Google operates the largest buy-side intermediaries for advertisers, *i.e.*, the ad buying tools for both small and large advertisers.

**VI.  GOOGLE'S MARKET POWER**

53.  Google has market power in the ad server market in the United States as confirmed by its

high market share. More than 90 percent of large publishers use Google's publisher ad server, GAM, according to published reports.

54. Google's documents also measured that GAM served the vast majority of all online display ad impressions in the United States.

55. Google has market power in the United States in the display ad exchange market.

56. Google's display ad exchange has the largest amount of commerce on its exchange in the United States since at least 2013.

57. Google acknowledges that its fees are high, and that Google can demand high fees because of its market power.

## VII. ANTICOMPETITIVE CONDUCT

### A. Google forces publishers to trade in Google's ad exchange

58. Google has pursued and executed a strategy to dominate the market by developing their ad server and ad exchange.

59. Prior to 2009, Google operated an ad-buying tool for small advertisers and had market power in that market.

60. Advertisers, including restaurants, clothing stores, doctors, and electricians, across the country used its ad buying tool for small advertisers to bid on display ad space.

61. Immediately after acquiring a publisher ad server and launching its exchange in 2009, Google forced the small advertisers bidding through Google Ads (Google's advertiser-side tool, which was previously called Google Adwords) to transact in both Google's ad network and Google's ad exchange.

62. Similarly, Google also forced large publishers desiring bids from the advertisers who used Google's ad buying tool to trade in Google's exchange and Google's ad server.

63. Google demanded that it represent the buy-side, where it extracted one fee, as well as the sell-side, where it extracted a second fee, and forced transactions to clear in Google's exchange, where Google extracted a third fee.

64. Google effectively required publishers to use its publisher ad server in order to work with its exchange. Since publishers only use a single ad server at a time to manage inventory, they had to either

forgo the use of any competing ad server or forgo access to the enormous pool of advertisers bidding through Google Ads.

65.     Google's conduct successfully foreclosed competition in the publisher ad server and exchange markets.

66.     Google used its control over publishers' inventory and its status as publishers' agent to foreclose exchange competition through a pattern of anticompetitive conduct.

67.     Google restricted publishers from selling their inventory in more than one exchange at a time, started routing publishers' inventory to Google's exchange, and blocked publishers from accessing and sharing information about their heterogeneous inventory with exchanges.

68.     Competition between exchanges promotes price competition. To circumvent this, Google impeded real-time competition between marketplaces by forcing publishers (sellers) to route their ad space to a single exchange, one at a time, rather than all at once – a practice known as waterfalling.

69.     In addition to blocking real-time competition between exchanges, Google's ad server foreclosed exchange competition by preferentially routing publishers' inventory to Google's new exchange through a process it called "dynamic allocation."

70.     Dynamic allocation granted Google's exchange a superior right of first refusal on all of a publisher's impressions made available to exchanges. Thus, Google blocked other exchanges from competing against its exchange for the same inventory on the same footing.

71.     Google used waterfalling to block other exchanges from competing simultaneously for impressions.

72.     Through dynamic allocation, Google's ad server passed inside information to Google's exchange and permitted Google's exchange to purchase valuable impressions at artificially depressed prices.

73.     Publishers were deprived of competitive bids and competing exchanges, leaving them with the low-value impressions passed over by Google's exchange.

**B.     Header Bidding: A threat to Google's dominance which Google eliminated by its agreement with Facebook**

74.     To reinject competition and to bypass Google in the marketplace, in 2014, publishers

devised an innovation called header bidding.

75.     In order to return the highest bid for the inventory, header bidding routed ad inventory to multiple neutral exchanges each time a user visited a web page.

76.     Publishers, advertisers, and exchanges quickly adopted the method to facilitate exchange competition.

77.     Some of the biggest tech companies participated in header bidding and, by 2015, publishers and advertisers were rapidly adopting the innovation.

78.     By 2016, about 70 percent of major online publishers in the United States had adopted header bidding.

79.     Advertisers also migrated to header bidding in droves because it helped them to optimize the purchase of inventory through the most cost-effective exchanges.

80.     Header bidding was a creative piece of code that publishers could insert into the header section of their webpages to facilitate competition between exchanges. When a user visited a page, the code enabled publishers to direct a user's browser to solicit real-time bids from multiple exchanges before Google's ad server could prevent them from doing so. Header bidding shifted routing from the ad server to the browser so that bidding would not be subject to the control of Google's ad server. Publishers then sent the highest exchange bid in header bidding into their Google ad server. In short, header bidding created a technical workaround for publishers to circumvent Google's efforts to foreclose competition in the exchange market.

81.     Publishers and advertisers adopted the protocol because they came to realize what Google already knew. Waterfalling, dynamic allocation, and enhanced dynamic allocation did not actually maximize publishers' yield. Instead, as Google discussed behind closed doors, with header bidding, publishers saw their ad revenue jump overnight simply because exchanges could compete.

82.     Header bidding was also a positive development for advertisers and consumers. Header bidding allowed advertisers to transact through an exchange of their choosing, including those that charged less than Google's fees.

83.     The adoption of header bidding threatened Google's margins on its exchanges and disrupted Google's practice of front running and trading on "inside" information. The competition in ad

servers threatened Google's market power.

84.    In response to header bidding, Google introduced an alternative that secretly routed publishers' inventory back to Google's exchange, even though another exchange had returned a higher bid.  By inserting its own exchange into the process, Google was able to charge participants a 5-10% fee on winning bids.

85.    In time, Google's goal was to destroy header bidding entirely.

86.    Beginning in 2018, Google's ad server started redacting various data fields from the consolidated auction records that it shares with publishers.

87.    The redactions make it nearly impossible for publishers to compare the performance of exchanges in header bidding with the performance of exchanges going through Google's ad server. Consequently, Google renders the entire reason publishers use header bidding (to increase yield through head-to-head exchange competition) unobservable and unmeasurable.

88.    Google also limited the publishers' use of header bidding by capping the number of permissible "line items"—a technical ad server line of code that publishers need to use in order to run header-bidding auctions.

89.    Instead of increasing line items to enhance publishers' yield or innovating to provide a single line-item solution like OpenX, Google used its veto power to undermine its own clients.

90.    Header bidding is only possible if publishers can insert JavaScript code into the header section of their webpages. To respond to the threat of header bidding, Google created Accelerated Mobile Pages ("AMP"), a framework for developing mobile web pages, and made AMP essentially incompatible with JavaScript and header bidding.

### C.    The Illegal Facebook Agreement

91.    By 2017, Facebook was well positioned to compete with Google's ad server. Without control over publishers' inventory, Google would lose the ability to block exchange competition and tilt trading to Google.

92.    Google and Facebook operate the largest ad networks for display and in-app mobile inventory in the United States. In this regard, the companies compete head-to-head in publishers' ad auctions to purchase inventory for, ultimately, their advertisers.

93.     In March 2017, Facebook announced it would support header bidding. By doing so, Facebook would enable web and mobile app publishers and advertisers to bypass the fees associated with transacting through Google's ad server.

94.     When bidding into Google's ad server, networks, such as Facebook's network (FAN), had to bid into exchanges and pay exchange fees. Because header bidding cost nothing, Facebook would let web publishers, mobile app publishers, and advertisers save on these fees altogether. The same day as Facebook's March 2017 header bidding announcement, the industry publication *AdAge* wrote that Facebook was poised to execute a "digital advertising coup against rival Google and its DoubleClick empire."

95.     A Business Insider headline the same day read, "Facebook Made an Unprecedented move to Partner With Ad Tech Companies – Including Amazon – to Take on Google."

96.     Facebook was helping publishers and advertisers match two to three times more users in auctions and increase third-party publishers' revenue by 10 to 30 percent, according to Facebook metrics posted in Facebook's public blog.

97.     Facebook was prepared to challenge Google's monopoly.

98.     Google responded to the threat of competition in part by, after months of negotiations, entering into the Facebook Agreement, an illegal agreement by which Facebook would stop supporting header-bidding technology.

99.     Google approached Facebook about modifying its new program. According to internal Facebook communications, within months of Facebook's official header bidding announcement, Google and Facebook began formal negotiations. According to an internal Google November 2017 presentation, Facebook was interested in a successful outcome to these negotiations between horizontal competitors.

100.    The ultimate outcome of the negotiations was that in September 2018, Google and Facebook entered into the Facebook Agreement, in which Facebook agreed to limit its program in return for preferred treatment in the Google advertising business system.

101.    Google and Facebook restricted the innovation of header bidding to their benefit and in direct hindrance of competition in violation of Section 1 of the Sherman Act.

102.    Through this agreement, Facebook agreed with Google to strengthen Google's market

dominance in the online advertising industry.

103.   Facebook curtailed its header bidding initiatives and instead bid through Google's ad server.

104.   In return, Google agreed to give Facebook an advantage in its auctions by ensuring Facebook received special information, a speed advantage to assist Facebook in succeeding in the auctions, and a guaranteed win rate.

105.   Facebook agreed to shift from routing bids through header bidding to routing bids through Google's ad server in exchange for special auction access.

106.   Traditionally, when bidding into Google's ad server through Open Bidding, networks for web inventory like FAN had to bid into exchanges and pay exchange fees. With the agreement, Google gave Facebook a large-scale concession by allowing Facebook to have a direct billing relationship with websites where ads would appear (as opposed to other participants for whom Google controlled pricing information).

107.   Google also agreed to give Facebook a better understanding of who would be viewing the ads by assisting Facebook in identifying various users.

108.   Google also provided Facebook with a longer "timeout" at the auction. A timeout is a period of time between the ask and the required response.

109.   Google subjects other marketplaces competing for publishers' inventory in Open Bidding to 160 millisecond timeouts.  The longer timeouts agreed to by Google were designed to help Facebook win more auctions.

110.   In the Facebook Agreement, Google also promised to help Facebook recognize the identity of users in publishers' auctions.

111.   Since the Facebook Agreement, Google and Facebook have been working closely in an ongoing manner to help Facebook.

112.   Since the Facebook Agreement, Google, and Facebook also coordinate with each other to harm publishers through the adoption of Unified Pricing rules.

113.   In the Facebook Agreement, Google and Facebook also agreed to manipulate publisher auctions in Facebook's favor.

114. To sufficiently incentivize Facebook, Google and Facebook agreed to fix prices and allocate markets between them in the auctions for publishers' web displays and in-app advertising.

115. Google provided Facebook information advantages, speed advantages, and other prioritizations, to the detriment of other auction participants. The agreement allocated a portion of publishers' auction wins to Facebook, subverting the free operation of supply and demand.

116. Given the scope and extensive nature of cooperation between Google and Facebook, they were highly aware that their activities could trigger antitrust violations.

## VIII. ANTICOMPETITIVE EFFECTS

117. The Facebook Agreement was anticompetitive.

118. Evidence of the anticompetitive effects from Google's conduct includes the exit of rivals and limited and declining entry rates (despite significant profits enjoyed by Google).

119. The harm to competition deprives advertisers, publishers and consumers of improved quality, greater transparency, increased output, and/or lower prices.

### A. Anticompetitive Consequences of the Facebook Agreement

120. Google has charged supra-competitive fees and degraded quality in the ad exchange market.

121. Google abuses its scale in advertiser demand and information arising from its market power to create asymmetric advantages that benefit its exchange over rival exchanges. In doing so, Google harms competition in the exchange market.

122. For example, Google implements Last Look (a feature of the publisher ad server) to the benefit of Google's exchange over rival exchanges.

123. Google uses data from the publisher ad server to benefit its exchange over rival exchanges.

124. The artificial advantages created by Google's integration and asymmetric treatment drive scale for Google's exchange over rivals.

125. As Google wins additional share, it gains access to bid and win data at scale used to develop features that benefit the exchange over rival exchanges.

126. Google's conduct reduces rival exchanges' ability to compete on quality, since they are deprived of scale and are foreclosed from the information necessary to build similar features.

127.     Competition in the exchange market is harmed because Google's auction programs steer impressions to its own exchange. Competitors cannot effectively compete by lowering their take rate, since Google will use its information advantage to adjust its margin when needed to win an impression and recoup its subsidy on other impressions. By doing so, Google generates inefficiency in the allocation of impressions. This means that Google's average take rate does not reflect the inefficiency introduced because of Google's conduct.

128.     Google's anticompetitive conduct reduces the efficiency of matching impressions and ads, reducing the potential benefits of online display advertising for publishers, advertisers, and consumers.

129.     Plaintiffs and the Class have sustained antitrust injury as a direct and proximate cause of Google's unlawful conduct, which has increased advertisers' costs to advertise and reduced the effectiveness of their advertising, thereby harming businesses' return on investment in delivering their products and services and reducing output.

## IX.     CLASS ACTION ALLEGATIONS

130.     Plaintiffs bring this action on behalf of themselves and the Class as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

131.     The action seeks damages pursuant to the antitrust laws of the United States, specifically Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act during the period September 1, 2018 until the effects of the anticompetitive conduct alleged herein cease (the "Class Period").

132.     The Class is defined as "all persons and entities who, during the Class Period, purchased advertising on or over Facebook."

133.     Excluded from the Class are Google, Facebook, and their respective parent companies, subsidiaries, affiliates and any co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities and persons who purchased advertisements on or over Facebook.

134.     While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe there are tens of thousands of members of the Class.

135.     Common questions of law and fact exist as to all members of the Class. This is particularly true because of the unlawful Facebook Agreement, which is applicable to all members of the Class,

thereby making appropriate relief with respect to the Class as a whole.

136.    Questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Google engaged in a combination and conspiracy between itself and Facebook to restrict or destroy header bidding.

    b.    The legality of the Facebook Agreement.

    c.    The duration of the Facebook Agreement.

    d.    Whether the Facebook Agreement violated Section 1 of the Sherman Act.

    e.    Whether the conduct resulting from the Facebook Agreement caused injury to the business or property of Plaintiffs and the members of the Class.

    f.    The damages to be awarded to Plaintiffs and the Class.

137.    The questions of law and fact common to the Class predominate over any any questions affecting only individual members of the Class.

138.    Class adjudication is the superior method of resolving this matter. Class adjudication will promote judicial efficiency by eliminating the need for numerous and redundant proceedings. The amount of damages suffered by many advertisers may be so small as to make individual adjudication impracticable.

139.    The Plaintiffs do not know of any likely difficulties in managing the proposed class action.

140.    Plaintiffs' claims are typical of the claims of members of the Class and Plaintiffs will fairly and adequately protect the interests of the Class.

141.    Plaintiffs and all members of the Class are similarly affected by Google's wrongful conduct in that they paid artificially inflated prices for advertising on Facebook.

142.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

143.    Plaintiffs' interests are coincident with and not antagonistic to, those of the other members of the Class.

144.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

## X.    CLAIM FOR RELIEF

### Unlawful Agreement in Violation of Section I of the Sherman Act, 15 U.S.C. § 1

145.    Plaintiffs repeat and reallege every proceeding allegation as if fully set forth herein.

146.    Google and Facebook unreasonably restrained trade and harmed competition through an unlawful agreement to allocate auction wins and to fix prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

147.    Google wrongfully acquired and unlawfully maintained monopoly power in the relevant online display advertising markets, including the sell-side market for ad servers in the United States.

148.    The agreements between Google and Facebook are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

149.    Google's anticompetitive acts have substantially and adversely affected interstate commerce.

150.    Google's anticompetitive acts have had harmful effects on competition and consumers.

151.    By reason of the foregoing Plaintiffs and the Class have been damaged in amount to be determined at trial

## XI.    PRAYER FOR RELIEF

152.    Accordingly, the Plaintiffs request that the Court:

    a)    Adjudge and decree that Google has committed violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

    b)    Orders equitable relief as the Court deems necessary to enjoin and restrain Google and all of Google's agents or successors from engaging in the unlawful conduct set forth in this complaint.

    c)    Order monetary damages for violations committed of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 by Google, including costs and attorney's fees.

    d)    Certify a class of all persons who purchased advertisements on or over Facebook during the Class Period.

    e)    Award any other relief as it may deem proper.

## XII. DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a trial by jury of all issues properly triable by a jury in this case.

Dated: August 3, 2021

Respectfully submitted,

**CERA LLP**

By: ___/s/ Pamela A. Markert___
     Pamela A. Markert
Solomon B. Cera (Bar No. 099467)
Pamela A. Markert (Bar No. 203780)
595 Market St., Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Fax: (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

Fred T. Isquith, Sr. (*pro hac vice* forthcoming)
Robert S. Schachter (*pro hac vice* forthcoming)
Sona R. Shah (*pro hac vice* forthcoming)
**ZWERLING, SCHACHTER
  & ZWERLING, LLP**
41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969
Email: ftisquith@zsz.com
Email: rschachter@zsz.com
Email: sshah@zsz.com

Fred T. Isquith, Jr. (*pro hac vice* forthcoming)
**ISQUITH LAW**
220 East 80th Street
New York, NY 10075
Tel: (607) 277-6513
Email: isquithlaw@gmail.com

Heidi Silton (*pro hac vice* forthcoming)
Kate M. Baxter-Kauf (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401-2159

Tel: (612) 596-4092
Email: hmsilton@locklaw.com
Email: kmbaxter-kauf@locklaw.com

Richard Vita (*pro hac vice* forthcoming)
**VITA LAW OFFICES, P.C.**
100 State Street, Suite 900
Boston, MA 02109
Tel: (617) 426-6566
Email: rjv@vitalaw.com

*Attorneys for Plaintiffs and the Class*

CLASS ACTION COMPLAINT